[No. G029968. Fourth Dist., Div. Three. June 27, 2003.]

JOANNE COLT et al., Plaintiffs and Appellants, v.
FREEDOM COMMUNICATIONS, INC., et al., Defendants and
Respondents.

**COUNSEL**

Graham & Martin, Anthony G. Graham and Michael J. Martin for Plaintiffs and Appellants.

Akin Gump Strauss Hauer & Feld, Rex S. Heinke and Jessica M. Weisel for Defendants and Respondents

**OPINION**

**RYLAARSDAM, Acting P. J.**—Joanne Colt and Douglas Colt sued Freedom Communications, Inc., and Freedom Newspapers, Inc., for libel, invasion of privacy, interference with contractual relations, and interference with prospective economic advantage. The purported causes of action are based on articles published in the Colorado Springs Gazette, a newspaper owned by the defendants, and on an affiliated Web site. We affirm an order striking the complaint under the anti-SLAPP (strategic lawsuit against public participation) statute. (Code Civ. Proc., § 425.16; unless otherwise indicated, all further statutory references are to this code.) We so hold because plaintiffs failed to establish "that there is a probability that [they] will prevail on the claim." (§ 425.16, subd. (b)(1).)

FACTS

According to allegations in a complaint filed against him by the Securities and Exchange Commission (SEC), Douglas Colt "carried out an illegal scheme to manipulate the price of four stocks" during a two-month period in 1999 by "using a free subscription internet website called 'Fast-Trades.com.' [¶] . . . Through this scheme, centered on recommending stocks, Colt drove up the short-term price for each stock by as much as 700%. By trading in advance of the stock recommendations, Colt generated more than $345,000 in total profits for himself, [and others]." The complaint continues that "[b]y engaging in the transactions, acts, practices and courses of business alleged herein [Douglas] Colt violated the antifraud provisions of the federal securities laws."

The SEC complaint then spells out the details of the scheme and explains the involvement of others, including plaintiff Joanne Colt, a member of the Colorado Springs City Council and Douglas Colt's mother. According to that complaint, both plaintiffs profited from the deceptions. Although the lengthy complaint only names Douglas Colt as a defendant, as noted, it also contains allegations concerning the conduct of Joanne Colt.

Plaintiffs responded to the SEC action by stipulating to the entry of a consent decree. The decree permanently enjoined them from the conduct complained of in the complaint and "direct[ed] them to cease and desist from committing or causing any violation and any future violation of Section 10 (b) of the Exchange Act and Rule 10b-5 thereunder." Plaintiffs also consented to an order requiring them to disgorge their illicit profits; but in their complaint here they allege that "[b]ased on her demonstrated inability to pay, the Commission waived payment of disgorgement . . . ." The

reference to "her" in this statement seems to indicate that the waiver only applied to Joanne Colt. But Douglas Colt states in his declaration that the SEC waived his payment of disgorgement as well. Plaintiffs emphasize that they stipulated to the consent decree without admitting or denying the allegations of the SEC's complaint.

Plaintiffs' complaint alleges that articles defendants published in the Colorado Springs Gazette and on an associated Internet message board libeled them by making false statements about their trading activities, the charges filed against them by the SEC, and the effect of their consenting to the entry of the decree. Plaintiffs also make much of their contention that, although they entered into the consent decree, they did so only because of financial and other pressures and either that they really did not commit the acts charged against them by the SEC or that these acts were not, in fact, fraudulent. The record, which contains a detailed summary of the allegedly libelous statements and defendants' analysis, demonstrates that there were factual discrepancies between the SEC charges and defendants' reports.

Defendants' summary of the evidence filed in support of their motion to strike runs almost 30 pages, and we will not attempt to repeat all of it here. It is the thrust of defendants' position that (1) the articles "accurately convey the 'gist or sting' of the SEC's investigation and settlement," (2) that "such articles are absolutely privileged under the 'fair and true report' privilege in Civil Code Section 47, subd. (d) . . . and the First Amendment," (3) plaintiffs are public figures who must prove actual malice to recover, (4) several of the statements complained of do not damage plaintiffs' reputations, (5) some of the statements are jokes, "not reasonably susceptible to defamatory meaning," and (6) "many of the statements are substantially true."

Douglas Colt's declaration, filed in opposition to the motion, describes in considerable detail how he conducted his Internet operations and asserts that he never published false information. He denies that the SEC alleged that (1) he or his mother engaged in deceptive trading, (2) he or his mother made false statements, (3) his mother made any statements at all, (4) his mother had any involvement in the creation or maintenance of the Web site, (5) any misstatements were made in connection with the stock transactions, (6) the recommended stock was worthless, (7) he or his mother ever misrepresented themselves as investment advisers, or (8) he ever posted promotional statements. He also denies the truth of the SEC charges.

As does the complaint, the declaration states that he only consented to the entry of the decree against him "because of the enormous financial and

personal costs already incurred during the course of a year long investigation, and with even greater costs certain to be associated with defending against the SEC complaint . . . ." He also articulates statements made by defendants which arguably misstated the allegations made by the SEC and denies the truth of these statements. Finally he contends that because of the "SEC issue and the publicity generated by the numerous articles . . . ," he was unable to accept employment with the firm of Gibson, Dunn & Crutcher, defendants' lawyers.

The first of several lengthy exhibits to Douglas Colt's declaration is a 36-page submission made on his behalf to the SEC, before it filed its action, generally denying misdoing in connection with his Web site operation. Another exhibit is a copy of the SEC complaint. The remaining exhibits are copies of four Web pages and two e-mails apparently generated by defendants' reporter.

In the first of the Web pages, the reporter chronicles the scheme also described in the SEC complaint, without naming either plaintiff, but stating, inter alia, that the operator of the "pump and dump-type Web Sites, has been caught by the SEC." The reporter alleges that the scheme involved "using false information about the company . . . ." The second Web page is identical except for a handwritten interlineation on one reading "never held any shares" opposite the statement "and then dumped his shares." The third Web page contains essentially the same information as the first two and, again, the only reference to plaintiffs is "[t]he person who operated Fast-Trades.com." The last Web page attached to the declaration describes the substance of the conduct charged in the SEC complaint, and again fails to name either of the plaintiffs.

The remaining exhibits to Douglas Colt's declaration are two e-mails. The first contains a message from one Johnny Billson addressed to defendants' reporter and asserting "that Fast-Trades had not provided any false information about the companies they profiled," and the reporter's response indicating his agreement that plaintiff had not posted such information on the internet and that, when the reporter posted his message (presumably on the Internet) he "was in a rush . . . and somehow it came out wrong." In the second e-mail, responding to a question posed to him by one John Miller, the reporter again acknowledges that "Fast-Trades didn't post false information" and again explains his mistake as resulting from being "in a rush."

Joanne Colt furnished the court with a 24-page declaration in opposition to the motion. She too disclaims any wrongdoing although she acknowledges "settling" with the SEC. To her declaration she attaches copies of a large

number of newspaper articles on which she bases her libel claims. We mention further details of this evidence in our discussion below.

## DISCUSSION

*Standard of Review*

Section 425.16, the anti-SLAPP statute, applies to causes of action "arising from any act of [the defendant] in furtherance of the [defendant's] right of petition or free speech under the United States or California Constitution in connection with a public issue." (§ 425.16, subd. (b)(1).) Plaintiffs do not dispute that the publishing of newspaper articles fits this definition, nor could they in light of the First Amendment rights involved.

But the anti-SLAPP statute does not provide immunity. Instead, it places the burden on a plaintiff to establish "that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) ■ In order to do so, "plaintiff 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' [Citations.]" (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821 [123 Cal.Rptr.2d 19, 50 P.3d 733]; see also *Navellier v. Sletten* (2002) 29 Cal.4th 88, 89 [124 Cal.Rptr.2d 530].) To determine whether plaintiff has met this burden, the test is the same as for a motion for summary judgment. The court may not weigh the evidence or make credibility determinations; doing either would violate plaintiff's right to a jury trial. (*Kyle v. Carmon* (1999) 71 Cal.App.4th 901, 907-908 [84 Cal.Rptr.2d 303].) Further, the court may only consider the opposing evidence "to determine if it defeats the plaintiff's showing as a matter of law. [Citation.]" (*Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 906 [120 Cal.Rptr.2d 576].) We review the order de novo using these same standards.

■ Plaintiffs do not dispute defendants' contention that Joanne Colt was a "public figure" and that Douglas Colt was a "limited purpose public figure." As such, before plaintiffs can recover, they must show that defendants acted with actual malice. (*New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 283 [84 S.Ct. 710, 727, 11 L.Ed.2d 686, 95 A.L.R.2d 1412].) Thus, we must review plaintiffs' probability of prevailing under this higher standard: "Since . . . a jury verdict in a defamation case can only be supported when the actual malice is shown by clear and convincing evidence, rather than by a preponderance of evidence as in most other cases, [citation], the evidence and all the inferences which can reasonably be drawn from it must meet that higher standard." (*Rebozo v. Washington Post Co.* (5th

Cir. 1981) 637 F.2d 375, 381, as quoted in *Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 252 [208 Cal.Rptr. 137, 690 P.2d 610].)

*Effect of the Consent Decree*

 Although plaintiffs determinedly deny both the truth of the SEC allegations and that one may infer guilt from their stipulating to the entry of a consent decree, the First Amendment and Civil Code section 47, subdivision (d) permitted defendants to publish a "fair and true report" of the legal proceedings. (See *McClatchy Newspapers, Inc. v. Superior Court* (1987) 189 Cal.App.3d 961, 975 [234 Cal.Rptr. 702].) The question thus becomes whether the newspaper articles and Internet postings qualify as being fair and true. If so, plaintiffs are unable to show a probability of prevailing and we must affirm the dismissal of the action.

 As defendants point out, the "fair and true report" requirement does not limit the privilege to statements that contain no errors. Our Supreme Court recognized that " '[e]rroneous statement is inevitable in free debate, and . . . must be protected if the freedoms of expression are to have the "breathing space" that they "need . . . to survive." ' [Citation.]" *(Reader's Digest Assn. v. Superior Court, supra,* 37 Cal.3d at p. 261, quoting from *New York Times Co. v. Sullivan, supra,* 376 U.S. 254.) Thus the publication concerning legal proceedings is privileged as long as the substance of the proceedings is described accurately. "Under California law, a newspaper report is 'fair and true' if it captures ' "the substance, the gist, the sting of the libelous charge." ' [Citations.] The news article need not track verbatim the underlying proceeding. Only if the deviation is of such a 'substantial character' that it 'produce[s] a different effect' on the reader will the privilege be suspended. [Citation.] News articles, in other words, need only convey the substance of the proceedings on which they report, as measured by their impact on the average reader. [Citations.]" *(Crane v. Arizona Republic* (9th Cir. 1992) 972 F.2d 1511, 1519.)

*Discrepancies Between SEC Charges and Defendants' Reports*

 Plaintiffs draw fine distinctions between the misconduct charged in the SEC complaint and defendants' descriptions of this misconduct. They asked the trial court, and now ask us, to engage in a detailed parsing of words, phrases, and sentences to note the subtle differences between their misconduct and that noted in the articles. As defendants point out, this court's decision in *Jennings v. Telegram-Tribune Co.* (1985) 164 Cal.App.3d 119 [210 Cal.Rptr. 485] makes it clear that the law does not require us to do so. *Jennings* held that even a newspaper report that plaintiff was "convicted

of tax fraud" accurately conveyed the gist of judicial proceedings where plaintiff had pleaded no contest to failing to file tax returns. (*Id.* at p. 127.) We therefore decline the offer to engage in the hermeneutical exercise to which plaintiffs have challenged us.

We must now examine whether the facts reported by defendants so far deviated from the SEC charges as to go beyond the "the substance, the gist, the sting" of the charges against plaintiffs. The SEC complaint charges that Douglas Colt, then a law student, "carried out an illegal scheme to manipulate the price of four stocks using a free subscription internet website called 'Fast-Trades.com'" and by e-mailing recommendations to subscribers to the Web site. He made these recommendations after purchasing large quantities of the stock; after the recommendations resulted in an increase in the price of the stock, he and his cohorts would sell at the inflated price. They promoted the Web site "by posting false and misleading messages on hundred[s] of publicly accessible internet message boards. These messages disguised the authors' connection with the site and misrepresented the investment success they achieved from following Fast-Trades' recommendations. . . . [¶] Colt also included a false 'track record' on the Fast-Trades.com website . . . [¶] and misrepresented their trading intentions . . . ." Some 9,000 persons were potentially deceived by this scheme.

Defendants do not deny that their articles contained some errors concerning the details of plaintiffs' scheme. For example, the articles misattributed ownership of a particular stock to Colt. But while he may not have owned the described stock, his scheme did involve ownership of stock mentioned on the Web site. Plaintiffs take issue with statements in the articles that the Web site published false information about the touted stock; even if this was incorrect in an overly literal reading of the phrase, the touting of specific stock constituted an implied representation about its value. The characterization of the scheme as a "pump and dump scenario" fairly described the nature of the scheme detailed in the SEC complaint.

As additional evidence of the libel, plaintiffs point to a message allegedly posted by defendants, reading, "[Douglas Colt] has been caught by the SEC. [He] targeted [name of company] in March of last year. He drove the price up for a matter of hours using false information about the company, thus creating a buying frenzy, and then dumped shares." Plaintiff takes issue with the suggestion he was "caught"; but he was. Had he not been "caught," there would not be a consent decree. He argues that he did not post false information about the companies; but, as we noted, by touting the stocks, he implicitly represented that they were undervalued. The statement fairly describes the substance of plaintiffs' scheme. Were we to accept plaintiffs'

arguments, we would require that newspapers be limited to word-for-word quotations from legal documents. Of course, the law imposes no such requirement.

Plaintiffs also take issue with statements in the articles that the stock was "worthless." They draw comfort from an alleged admission by the reporter that "everyone knows that if a stock is still trading publicly, it is worth something," which is generally true. But the point was that the victims of plaintiffs' scheme parted with valuable consideration for stock that was either substantially worthless or certainly worth a great deal less than they paid for it.

It is not necessary to go through each of plaintiffs' parsing of words and sentences in the articles published by defendants to demonstrate that their quarrel with the language of the articles involves a level of exegesis beyond the ken of the average reader of newspaper articles. The articles fairly describe the gist of plaintiffs' misconduct. As noted, the privilege applies unless the differences between the facts and the manner in which they are described are "of such a 'substantial character' that [they] 'produce[] a different effect' on the reader . . . . [Citation.] News articles, in other words, need only convey the substance of the proceedings on which they report, as measured by their impact on the average reader. [Citations.]" (*Crane v. Arizona Republic, supra,* 972 F.2d at p. 1519.) The effect on readers of the articles would have been substantially the same as the effect on readers of the SEC complaint.

As a result, the articles are protected by the First Amendment and Civil Code section 47, subdivision (d). And therefore, plaintiffs have failed to demonstrate "that there is a probability that [they] will prevail on the claim." (§ 425.16, subd. (b)(1).) The trial court properly granted the anti-SLAPP motion.

*Lack of Actual Malice*

██ As noted earlier, before plaintiffs can demonstrate the existence of a prima facie case, they must present clear and convincing evidence of actual malice. This they failed to do. Their inability to provide such evidence provides an additional basis requiring us to affirm the judgment.

In support of their claim there was evidence of actual malice, plaintiffs argue that defendants' reporter acknowledged he had known statements to be untrue when he made them. No record reference is furnished for this statement, and we may thus ignore it. (*Bernard v. Hartford Fire Ins. Co.*

(1991) 226 Cal.App.3d 1203, 1205 [277 Cal.Rptr. 401] [on appeal party must provide page citations to record]; *People v. Dougherty* (1982) 138 Cal.App.3d 278, 282-283 [188 Cal.Rptr. 123] [argument of counsel is insufficient; briefs must contain factual underpinning, record references, argument, and authority].) But although we cannot be sure absent record references, we presume that this contention is based on the e-mails from defendants' reporter wherein he acknowledges having made an error when stating that Fast-Trades posted false information; he explains the error by stating, "I was in a rush when I posted the message and it somehow came out wrong." This may qualify as negligence, but it is hardly clear and convincing evidence of malice.

Plaintiffs offer another bit of evidence, again without a record reference, that they argue constitutes evidence of malice, i.e., a statement made by the reporter that "Doug Colt used the website 'solely to offer bogus stock tips to get investors to buy worthless stock that he owned.'" Although this does not precisely describe the scheme employed by plaintiffs, it certainly describes the gist of it and is far from clear and convincing evidence of malice. Other contentions of the existence of evidence of actual malice are of the same inconsequential nature.

*Conclusion*

Plaintiffs fail to acknowledge that the newspaper was entitled to draw conclusions from their consenting to the entry of a decree based on the SEC complaint. The fact that they "admitted no wrongdoing" did not provide them with a shield from adverse publicity. The situation is analogous to that of an accused criminal who enters a plea of nolo contendere. His action for defamation against a reporter of the details of the crime with which he was charged would fail. And this would be true even if the reporter noted that he had been charged with attacking his victim with a tire iron when in reality it had been a ball-peen hammer.

DISPOSITION

The judgment of dismissal is affirmed. Respondents shall recover their costs and attorney fees on appeal.

Aronson, J., and Ikola, J., concurred.

A petition for a rehearing was denied July 28, 2003, and appellants' petition for review by the Supreme Court was denied September 24, 2003.