[No. G038555. Fourth Dist., Div. Three. June 13, 2008.]

SUSAN PATERNO, Petitioner, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
AMPERSAND PUBLISHING, Real Party in Interest.

## Counsel

Holland & Knight, Charles D. Tobin, Judith F. Bonilla and Shelley G. Hurwitz for Petitioner.

No appearance for Respondent.

Dreier Stein & Kahan, Stanton L. Stein, Samuel R. Pryor, Lauren Sudar and Jesse M. Leff for Real Party in Interest.

## Opinion

**ARONSON, J.**—Here we consider whether a plaintiff in a defamation action subject to the constitutional malice standard established the requisite "good cause" (Code Civ. Proc., § 425.16, subd. (g)) to conduct discovery, thereby delaying resolution of the defendant's pending anti-SLAPP motion.[1] We conclude that where, as here, the plaintiff fails to demonstrate the allegedly defamatory statements are provably false factual assertions—which the plaintiff must do to establish the necessary probability of prevailing on its defamation claim—no good cause exists to conduct discovery concerning

---

[1] A plethora of appellate litigation has made the SLAPP acronym a household word—at least in legal households. SLAPP stands for strategic lawsuit against public participation, and is codified in Code of Civil Procedure section 425.16. All statutory references are to the Code of Civil Procedure, unless otherwise noted.

actual malice. We therefore grant the writ petition, and direct the trial court to vacate its discovery order and enter a new order denying plaintiff's discovery motion.

I

FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff and real party in interest Ampersand Publishing (Ampersand) is the corporate owner of the Santa Barbara News-Press. Wendy McCaw, its principal, publishes the newspaper. Defendant and petitioner Susan Paterno directs the journalism program at Chapman University in Orange, California, and is a senior writer for the American Journalism Review, a magazine published by the University of Maryland.

Paterno wrote an article, *Santa Barbara Smackdown*, for the magazine's December 2006 issue. The article offered a "behind-the-scenes look" at the "turmoil" engulfing the News-Press, including the dismissal or resignation of more than half of its 50-member newsroom, leaving others to work in a "climate of fear and paranoia ripped from the pages of Kafka's 'The Trial . . .' . . . ." The article described McCaw's efforts to "silence" criticism by filing or threatening to file libel lawsuits.

In preparing for the article, Paterno spoke with more than a dozen former employees, and reviewed court records and documents. Ampersand refused permission to contact current employees; its lawyers informed her that such efforts "are by no means protected activities" and were "actionable." Ampersand suggested instead that she submit written questions to its public relations and crisis management consultant, which would be "reviewed by the appropriate News-Press agents and employees, including Wendy McCaw, and . . . answered when appropriate." Paterno declined the offer.

Ampersand filed a libel and trade disparagement lawsuit against Paterno for falsely implying that McCaw's personal agenda improperly influenced the newspaper's reporting. To the contrary, the complaint alleges, "Ampersand management (including . . . McCaw) has sought to *end* bias at the paper . . . ." (Original italics.) The complaint alleged that Paterno's article contained 32 libelous statements.[2]

---

[2] While the complaint identifies 33 libelous statements, two of them (relating to killing a story about Travis Armstrong's drunk driving sentence) are virtually indistinguishable and will be treated as the same.

Paterno filed a timely special motion to strike under the anti-SLAPP statute. To prevail on the motion, Paterno had to make a threshold showing that her conduct occurred in furtherance of the constitutional right of free speech in connection with a public issue or an issue of public interest. (§ 425.16, subd. (e)(4).) The burden then would shift to Ampersand to demonstrate a probability of prevailing on the claim. (§ 425.16, subd. (b)(1).)

Ampersand conceded Paterno's statements arose from constitutionally protected activity, thereby meeting the first prong of the anti-SLAPP statute. But Ampersand claimed its evidence demonstrated a probability it would prevail on the merits, thwarting the motion to strike.

Ampersand filed a motion for expedited discovery pursuant to section 425.16, subdivision (g).[3] Ampersand sought to depose Paterno and her editorial assistant Hallie Falquet to obtain any documents "reflect[ing], relat[ing] or refer[ring]" to their preparation of the article. It also sought documents from the American Journalism Review relating to the article. Ampersand claimed this "limited" discovery was necessary to show Paterno's subjective state of mind regarding the truth or falsity of her statements. According to the motion, "There is a great deal of information with respect to this incident that Paterno did not include in her libelous account, and Ampersand is entitled to discovery with respect to what Paterno knew about the incident, and what information she deliberately chose not to include in her story so as to paint a false picture."

Ampersand's attorney, Stanton Stein, attached a one-page declaration to the motion authenticating Ampersand's proposed document requests and deposition notices. His declaration discussed neither the relevancy nor the need for the discovery, and did not describe whether Ampersand made any efforts to obtain the requested information through other means.

At the hearing on the motions, the trial court concluded Ampersand had not met its burden to show a probability of success on 29 of the 32 libelous statements because "[m]ost appear as a matter of law to be opinion, or [Ampersand] fails to establish prima facie falsity." The trial court, however, found that Ampersand met its burden of proof on 3 of the 32 statements, and subsequently issued a formal order granting Ampersand leave to conduct discovery on whether Paterno made the following three statements with actual malice:

---

[3] Section 425.16, subdivision (g) provides: "All discovery proceedings in the action shall be stayed upon the filing of a notice of motion made pursuant to this section. The stay of discovery shall remain in effect until notice of entry of the order ruling on the motion. The court, on noticed motion and for good cause shown, may order that specified discovery be conducted notwithstanding this subdivision."

(1) that orders from "on high" forced former News-Press editor Jerry Roberts to "kill" a story about a drunk driving sentence imposed on the editorial page editor, Travis Armstrong;

(2) that the News-Press pursued a workplace restraining order against former employee Michael Todd, costing him approximately $7,000 in attorney fees, before dropping the case in October 2006; and,

(3) that Ampersand "slashed" benefits and overtime pay for newsroom employees over a two-year period.

The court continued the hearing on Paterno's anti-SLAPP motion to allow Ampersand to depose Paterno and Falquet, and obtain the subpoenaed documents.

Paterno filed a petition for writ of mandate with this court, contending all the statements were true, and that the third statement amounted to nonactionable opinion. We issued a temporary stay and an order to show cause. Ampersand filed a verified return, and Paterno filed a reply.

## II

### DISCUSSION

A. *The Anti-SLAPP Statute's "Good Cause" Requirement for Discovery*

Ampersand contends relevance is the sole criterion to determine whether a defamation plaintiff may delay a hearing on an anti-SLAPP motion to conduct discovery on actual malice. According to Ampersand, "The trial court's ruling is consistent with the anti-SLAPP statute and the case law, which establishes that courts should exercise their discretion liberally when considering a request for discovery regarding the defendant's state of mind in defamation cases." Having demonstrated to the trial court's satisfaction the relevance of the requested discovery on the issue of malice, Ampersand argues it satisfied the anti-SLAPP statute's "good cause" requirement for discovery. (§ 425.16, subd. (g).)

 Relevancy, however, is not the only hurdle a defamation plaintiff must overcome to establish good cause for discovery, given the purpose of anti-SLAPP legislation. To "encourage continued participation in matters of public significance" (§ 425.16, subd. (a)), the anti-SLAPP statute "protect[s] defendants from having to expend resources defending against frivolous SLAPP suits unless and until a plaintiff establishes the viability of its claim by a prima facie showing" (*Britts v. Superior Court* (2006) 145 Cal.App.4th

1112, 1124 [52 Cal.Rptr.3d 185] (*Britts*); see also *Sipple v. Foundation for Nat. Progress* (1999) 71 Cal.App.4th 226, 247 [83 Cal.Rptr.2d 677] (*Sipple*) ["We conclude that to allow appellant such extensive discovery would subvert the intent of the anti-SLAPP legislation."]). "Indeed, '[t]he point of the anti-SLAPP statute is that you have a right *not* to be dragged through the courts because you exercised your constitutional rights.' " (*Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 193 [25 Cal.Rptr.3d 298, 106 P.3d 958], original italics.)

■ The anti-SLAPP statute reinforces the self-executing protections of the First Amendment. In *Krinsky v. Doe 6* (2008) 159 Cal.App.4th 1154 [72 Cal.Rptr.3d 231], the court directed a trial court to quash a subpoena to discover the identity of an anonymous Internet poster. To protect First Amendment expression, *Krinsky* required the discovery proponent to make a prima facie showing the message board statement was libelous. (See Civ. Code, § 44 ["libel" defined as defamation effected in writing].) "Requiring at least that much ensures that the plaintiff is not merely seeking to harass or embarrass the speaker or stifle legitimate criticism." (*Krinsky*, at p. 1171.)

The constitutional malice standard under *New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 280 [11 L.Ed.2d 686, 84 S.Ct. 710], protects freedom of expression by requiring public figure plaintiffs who bring defamation actions to plead and prove falsehood, and to further establish actual malice by clear and convincing evidence. (See *Christian Research Institute v. Alnor* (2007) 148 Cal.App.4th 71 [55 Cal.Rptr.3d 600] (*Christian Research*).) "To state a defamation claim that survives a First Amendment challenge, thus, a plaintiff must present evidence of a statement of fact that is 'provably false.' " (*Nygård, Inc. v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1048 [72 Cal.Rptr.3d 210] (*Nygård*) see Civ. Code, § 45, italics added [defamation requires a *"false and unprivileged publication* . . . [that] exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation"].)

Accordingly, plaintiffs who bring defamation actions subject to the constitutional malice standard cannot show good cause for discovery on the question of actual malice without making a prima facie showing that the defendant's published statements contain provably false factual assertions. Trial judges should refrain from ordering "unnecessary, expensive and burdensome" discovery proceedings "if it appears from the SLAPP motion there are significant issues as to falsity or publication—issues which the plaintiff should be able to establish without discovery . . . ." (*The Garment Workers Center v. Superior Court* (2004) 117 Cal.App.4th 1156, 1162 [12 Cal.Rptr.3d 506] (*Garment Workers*) [no "good cause" for discovery under § 425.16, subd. (g), on issue of actual malice because trial court failed to determine whether defendant's allegedly defamatory statements were false].)

Our Supreme Court explored, in *Mitchell v. Superior Court* (1984) 37 Cal.3d 268 [208 Cal.Rptr. 152, 690 P.2d 625] (*Mitchell*), the First Amendment underpinnings for the rule that a plaintiff must demonstrate falsity before obtaining invasive and expensive discovery concerning the defendant's allegedly malicious mental state. In *Mitchell,* the Supreme Court issued a writ of prohibition to block a plaintiff's efforts to engage in wide-ranging discovery from a couple who furnished the allegedly defamatory information to Reader's Digest magazine. The plaintiff, Synanon, "wanted to review all documents available to the [couple] in order to prove that [they] selectively relied on some documentary evidence and ignored other evidence more favorable to Synanon." (*Id.* at p. 273.) To safeguard the freedom of expression enshrined in the First Amendment, the high court concluded a plaintiff in such circumstances must "make a prima facie showing that the alleged defamatory statements are false before requiring disclosure." (37 Cal.3d at p. 283.) The court reasoned, " '[t]he falsity of the . . . charges . . . should be drawn into question and established as a jury issue before discovery is compelled,' " because " 'to routinely grant motions seeking compulsory disclosure . . . without first inquiring into the substance of a libel allegation would utterly emasculate . . . fundamental principles . . . .' " (*Ibid.*)

In analogous situations involving other fundamental constitutional rights, such as the right to privacy, courts have required discovery proponents to demonstrate a "compelling public interest" for discovery which is "directly relevant" to the litigation. "Discovery of constitutionally protected information is on a par with discovery of privileged information and is more narrowly proscribed than traditional discovery." (*Tylo v. Superior Court* (1997) 55 Cal.App.4th 1379, 1387 [64 Cal.Rptr.2d 731] [trial court in a wrongful termination case abused its discretion in ordering former employee to answer questions relating to her marital relationship].) "Because the requested material is constitutionally protected, the ordinary yardstick for discoverability, i.e., that the information sought may lead to relevant evidence, is inapplicable." (*Juarez v. Boy Scouts of America, Inc.* (2000) 81 Cal.App.4th 377, 392 [97 Cal.Rptr.2d 12]; see also *Planned Parenthood Golden Gate v. Superior Court* (2000) 83 Cal.App.4th 347, 369 [99 Cal.Rptr.2d 627] [appellate court reversed discovery order requiring staff members of family planning nonprofit organization to reveal home addresses and telephone numbers to antiabortion litigants; discovery proponents "have not demonstrated a need for the discovery which would justify an invasion of the substantial privacy interests involved"]; *Barrenda L. v. Superior Court* (1998) 65 Cal.App.4th 794, 802 [76 Cal.Rptr.2d 727], italics added [proponent in sexual molestation case failed to show "good cause" that discovery was both "relevant *and necessary*" to determine the cause of plaintiffs' emotional distress].)

Ampersand misconstrues dicta in *Lafayette Morehouse, Inc. v. Chronicle Publishing Co.* (1995) 37 Cal.App.4th 855, 868 [44 Cal.Rptr.2d 46]

(*Lafayette Morehouse*), an early anti-SLAPP case, for the proposition that trial courts should "liberally" allow pre-SLAPP discovery in defamation cases. The court in *Lafayette Morehouse* affirmed the dismissal of a libel action against a newspaper because the anti-SLAPP statute applied to news reporting activities. The court hinted, in dicta, that trial courts should "liberally" exercise their discretion to authorize reasonable discovery "*when evidence to establish a prima facie case is reasonably shown to be held, or known, by defendant* or its agents and employees." (*Lafayette Morehouse*, at p. 868, italics added.)

■ The *Lafayette Morehouse* decision "predate[s] the 1997 amendment requiring a broad interpretation of section 425.16." (*Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468, 478 [102 Cal.Rptr.2d 205].) Accordingly, we join the courts that have limited the reach of *Lafayette Morehouse*'s language. (*Damon*, at p. 478; see also *Nygård, supra*, 159 Cal.App.4th at pp. 1037–1038 [holding that *Lafayette Morehouse* applied too narrow a definition of "public forum" in the context of newspaper and magazine articles].)

Here, as we explain below, Ampersand has not introduced sufficient evidence to establish a prima facie case of falsity or unprivileged statements. Consequently, the trial court erred in permitting discovery concerning Paterno's actual malice. Absent the prerequisite of provably false facts (*Nygård, supra*, 159 Cal.App.4th at pp. 1048–1049; *Garment Workers, supra*, 117 Cal.App.4th at p. 1162), no good cause supported the discovery order, which we therefore countermand.[4]

B. *Paterno Had No Constitutional Obligation to Include in Her Article Ampersand's Explanation Concerning Its Decision Not to Run a Story About Travis Armstrong's Drunk Driving Sentence*

The trial court permitted discovery into whether Paterno harbored actual malice when her article stated that (1) former News-Press editor Jerry Roberts "was ordered to kill a story about the editorial page editor's drunk-driving

---

[4] We note Ampersand's discovery motion not only failed to show the existence of provably false facts, but also failed to address the antecedent, threshold issue of "whether the information the plaintiff seeks to obtain through formal discovery proceedings is readily available from other sources or can be obtained through informal discovery." (*Garment Workers, supra*, 117 Cal.App.4th at p. 1162.) Attorney Stein's declaration documented no attempts to informally contact, for example, Hallie Falquet, Paterno's research assistant, who was not named as a defendant in the lawsuit. Ampersand apparently interviewed no witnesses concerning malice, tracked down no speaking engagements, academic conferences, or other iterations of Paterno's piece, nor otherwise conducted any investigation before attempting to inflict the discovery process on Paterno. These omissions alone required denial of Ampersand's motion. (*Ibid.*)

sentence" and (2) when reporter Dawn Hobbs returned from court with a report on Armstrong's drunk driving sentence, "[O]rders 'from on high' forced Roberts to kill Hobbs' story, says then Deputy Managing Editor Murphy . . . ."

Ampersand never contested the literal truth of these statements. McCaw herself wrote a letter to the Society of Professional Journalists stating that management decided to "kill" the story about the drunk driving sentence imposed on Travis Armstrong, the newspaper's editorial page editor.

Ampersand nevertheless argues, and the trial court apparently agreed, that Paterno's article could be deemed false because she "omitted material facts available to her . . . ." Ampersand contends Paterno's statements about killing a story, while true, are actionable because the " 'gist and sting' " of the article "was that the story was killed because the publishers were directing the news content to protect favored employees, such as Armstrong. This is not true."

Ampersand specifically takes Paterno to task for failing to mention that the newspaper had previously published an article concerning Armstrong's *arrest* for drunk driving on May 7, 2006. In a declaration filed in Ampersand's anti-SLAPP opposition, Armstrong described his complaints to senior management about the unfairness of this story given Roberts's "open animosity" to him. As part of Ampersand's opposition, copublisher Arthur Von Wiesenberger declared that he directed Roberts not to publish any further stories about Armstrong's DUI (driving under the influence) sentence because "it appeared unethical for Roberts to use his position as editor to carry out what seemed to be a vendetta against Armstrong." Reduced to essentials, this defamation claim arises out of Paterno's failure to include Ampersand's side of the story.

 This novel theory of liability, which Paterno describes as "defamation by omissions," fails. Media defendants are liable for calculated falsehoods, not for their failure to achieve some undefined level of objectivity. "Slanted reporting, however, does not by itself constitute malice." (*Christian Research, supra*, 148 Cal.App.4th at p. 88.) Paterno's truthful statements enjoy First Amendment protection and, in publishing them, she is entitled to a "reasonable degree of flexibility in [the] choice of language . . . ." (*Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 262 [208 Cal.Rptr. 137, 690 P.2d 610] (*Reader's Digest*).)

*Reader's Digest* illustrates the leeway guaranteed to the press under the First Amendment's mandate. The case grew out of the same core facts as *Mitchell*, but involved the reporters instead of their sources. In *Reader's Digest*, the California Supreme Court issued a writ of mandate to compel

dismissal of Synanon's defamation lawsuit against the reporters for their description of a long-running battle between Synanon and the publishers of a small town newspaper in Marin County. "We recognize a potential chilling effect from protracted litigation as well as a public interest in resolving defamation cases promptly." (*Reader's Digest, supra,* 37 Cal.3d at p. 252.) The court held that the magazine had no duty "to write an objective account" of the dispute or to tell Synanon's side of the story. (*Id.* at p. 259.) "The Reader's Digest could properly tell the story of how the Mitchells won the Pulitzer Prize, and in that story reflect the Mitchells' views on Synanon, without also presenting Synanon's side of the picture." (*Ibid.*)

As *Reader's Digest* holds, Paterno had no constitutional obligation to incorporate Ampersand's press releases or its talking points into her magazine article. There is no constitutional mandate requiring the press to adopt a "he said, she said" style of reporting. Indeed, the actual malice standard is not measured by what an objectively reasonable reporter would have written. "Fair and objective reporting may be a worthy ideal, but there is also room, within the protection of the First Amendment, for writing which seeks to expose wrongdoing and arouse righteous anger; clearly such writing is typically less than objective in its presentation." (*Reader's Digest, supra,* 37 Cal.3d at p. 259.)

If Paterno's statements require further explanation, Ampersand, McCaw, its lawyers, public relations experts, and crisis managers, are free to provide them. Ampersand, as the publisher of Santa Barbara's largest circulation daily newspaper, has ample " 'access to the channels of effective communication.' " (*Christian Research, supra,* 148 Cal.App.4th at p. 92.) "The marketplace of ideas, not the tort system, is the means by which our society evaluates those opinions." (*Grillo v. Smith* (1983) 144 Cal.App.3d 868, 872 [193 Cal.Rptr. 414].) It is ironic that Ampersand, itself a newspaper publisher, seeks to weaken legal protections that are intended to secure the role of the press in a free society. Newspapers and publishers, who regularly face libel litigation, were intended to be one of the " 'prime beneficiaries' " of the anti-SLAPP legislation. (*Lafayette Morehouse, supra,* 37 Cal.App.4th at p. 863.)

### C. *Paterno Had No Constitutional Obligation to Provide Ampersand's Explanation Why It Dropped Its Efforts to Obtain a Restraining Order*

Ampersand claimed Paterno made a false statement in her article concerning a dispute between former business editor Michael Todd and Ana Fuentes, a part-time photographer. The incident arose when Todd made what he considered to be a joke to Fuentes about hitting her with his car, but Fuentes viewed the statement as a threat. According to the article, "The News-Press

pursued a restraining order against Todd in connection with the Fuentes episode in July, costing him close to $7,000 in attorney's fees, he says, before dropping the case in late October."

Ampersand does not dispute the truth of the article's assertions that Ampersand abandoned its request for a temporary restraining order and that Todd said it cost him $7,000 in attorney fees. As with the claim about killing the drunk driving story, Ampersand contends Paterno's article implies "provably false" facts by "omitting key facts" from the story. "Specifically, Paterno omits from her Article the material fact that Ampersand no longer had standing to pursue the action after Ana Fuentes left the [newspaper's] employ . . . . By omitting this fact, and by stating that the case was dropped after Michael Todd was forced to incur substantial legal fees, Paterno implies the false factual assertions that the case was filed for an improper purpose, and that the News-Press arbitrarily decided to drop the case after forcing Mr. Todd to incur substantial legal fees."

Paterno's report on Ampersand's dismissal of the Todd complaint is absolutely privileged as a matter of law as a fair report of a statement made in an official judicial proceeding. (Civ. Code, § 47, subd. (d).) There is nothing inaccurate about the reference. Ampersand's demand for "context" therefore fails as a basis for alleging the falsity necessary for defamation and, consequently, also fails to establish the requisite good cause for discovery.

In *Colt v. Freedom Communications, Inc.* (2003) 109 Cal.App.4th 1551 [1 Cal.Rptr.3d 245], we affirmed an order dismissing a SLAPP complaint against a newspaper for libel. The plaintiffs claimed that the newspaper failed to accurately report why they entered into a federal consent decree after federal regulators filed a complaint alleging the plaintiffs promoted an illegal stock manipulation scheme. Although "the publication concerning legal proceedings is privileged as long as the substance of the proceedings is described accurately" (*id.* at p. 1558), courts will not engage in a "hermeneutical exercise" (*id.* at p. 1559) dissecting the reporter's efforts in a legalistic postmortem. Otherwise, litigation-averse journalists would be reduced to reporting "word-for-word quotations from legal documents." (*Id.* at pp. 1559–1560.) "It is not necessary to go through each of plaintiffs' parsing of words and sentences in the articles published by defendants to demonstrate that their quarrel with the language of the articles involves a level of exegesis beyond the ken of the average reader of newspaper articles. The articles fairly describe the gist of plaintiffs' misconduct." (*Id.* at p. 1560.)

Similarly, in *Sipple, supra,* 71 Cal.App.4th 226, a political consultant alleged that a magazine falsely reported a custody dispute where he was charged with domestic violence. The consultant claimed the gist and sting of

the article was false because the author omitted material facts showing the unreliability of the charges. The court held that the article was privileged, and the anti-SLAPP statute applied "to 'afford the utmost freedom of access to the courts without fear of being subsequently harassed by derivative tort actions' [citation] . . . ." (*Id.* at p. 241.) "Accordingly, we conclude that the article was a fair and true report. *It was not spun out of whole cloth,* but was supported by the court testimony . . . ." (*Id.* at p. 246, italics added.)

Here, Ampersand wants Paterno to go further than accurately conveying what happened in court. It demands Paterno place this legal proceeding in "context" by including what it considers are the "key facts"—even if they are outside the court record. There is no such requirement. As the case law amply demonstrates, journalists may simply report the facts of proceedings without providing an explanation of those facts. Here, Paterno's article conveyed the "substance" of the legal proceedings involving Todd. Because the litigation privilege applies, no basis exists to explore whether Paterno's statement was misleading. Consequently, the predicate for Ampersand's good cause showing for discovery is absent.

D. *Paterno's Description of the Newspaper's "Slashing" of Employee Benefits Is Not False, but Rather Constitutionally Acceptable "Literary License"*

The third allegedly false statement arises from the article's reference to claims by former staffers that the newspaper "slashed" their employee benefits and overtime pay. The article states, "In the next two years, though, [McCaw's] largely unexplained directives led to confusion, turmoil and turnover, with benefits and overtime pay slashed, newsroom decisions challenged and executives fired or forced to resign after refusing to do her bidding, *say former reporters, editors and executives.*" (Italics added.)

Ampersand's own brief concedes the newspaper's 401(k) plan "was indeed eliminated." But, Ampersand continues, this admitted fact, left unexplained, would convey the "false and defamatory" "impression" that Ampersand is an "arbitrary and abusive employer." Yolanda Apodaca, Ampersand's human resources director, declared Ampersand's overtime policy had not changed, contrary to Paterno's report. Thus, "[t]o the extent the newsroom at the News-Press was overstaffed from time to time, employees naturally took less overtime as there is less need for overtime when there are more employees available to do the work." She further declared that no employees complained about the overtime policy to her.

We do not see how the article's "slashed" statement warrants discovery against Paterno under the anti-SLAPP's statute's good cause requirement.

The article clearly explains that these claims about "slashed" benefits represent the views of the newspaper's former employees. As our Supreme Court held in the Synanon case, journalists are within their constitutionally protected rights to write an article describing the perspective of only one side of a controversy. (*Reader's Digest, supra*, 37 Cal.3d at p. 262.)

■ Equally important, Paterno's decision to publish former employees' opinions may not be tested for actual malice because the opinions are not provably false. Opinions that present only an individual's personal conclusions and do not imply a provably false assertion of fact are nonactionable; indeed, such opinions are the lifeblood of public discussion promoted by the First Amendment, under which speakers remain free to offer competing opinions based upon their independent evaluations of the facts. (*Nygård, supra*, 159 Cal.App.4th at pp. 1048–1049, discussing *Milkovich v. Lorain Journal Co.* (1990) 497 U.S. 1, 19 [111 L.Ed.2d 11, 10 S.Ct. 2695] (*Milkovich*).) "Thus, after *Milkovich*, the question is not strictly whether the published statement is fact or opinion. Rather, the dispositive question is whether a reasonable fact finder could conclude the published statement declares or implies a provably false assertion of fact. [Citations.] *Milkovich* did not change the rule that satirical, hyperbolic, imaginative, or figurative statements are protected because 'the context and tenor of the statements negate the impression that the author seriously is maintaining an assertion of actual fact.' [¶] Whether a statement declares or implies a provably false assertion of fact is a question of law for the court to decide." (*Franklin v. Dynamic Details, Inc.* (2004) 116 Cal.App.4th 375, 385 [10 Cal.Rptr.3d 429].)

Numerous post-*Milkovich* cases emphasize the distinctions between provably false statements of fact, which are actionable, and loose and figurative expressions of opinion, which are constitutionally protected under a totality of the circumstances test. (*Campanelli v. Regents of University of California* (1996) 44 Cal.App.4th 572 [51 Cal.Rptr.2d 891] [no liability for athletic director's statement that college basketball players felt "beaten down" by former coach's harsh methods]; *Ferlauto v. Hamsher* (1999) 74 Cal.App.4th 1394, 1404 [88 Cal.Rptr.2d 843] [no liability for "classic rhetorical hyperbole" about " 'creepazoid attorney' " and " 'loser wannabe lawyer' "]; *Moyer v. Amador Valley J. Union High School Dist.* (1990) 225 Cal.App.3d 720 [275 Cal.Rptr. 494] [no liability for student newspaper's assertion that teacher was "worst" teacher in school and a "babbler"].)

*Nygård* illustrates the distinction. There, a magazine published an interview with a former employee who described his "horrible" work experience with a prominent businessman. The employee claimed he endured around-the-clock pestering and " ' "slaved . . . without a break" ' " for his employer. (*Nygård,*

*supra*, 159 Cal.App.4th at p. 1033.) The court affirmed a special motion to strike because the employer failed to make a prima facie showing that any of the published statements conveyed provably false factual imputations. The court concluded the employee's statements "are nonactionable statements of opinion, rather than verifiable statements of fact. . . . Instead, ' "horrible" ' and a ' "horror" ' colorfully convey [the employee's] subjective belief that working for the company was unpleasant. His subjective reaction does not contain 'provable facts,' and no reasonable reader could understand these words as statements of actual working conditions." (*Id.* at p. 1052.)

Applying these principles here, Paterno's description of the News-Press as having "slashed" employee benefits is not actionable because it is protected opinion and does not imply a provably false assertion of fact. While Apodaca opined that the News-Press actually had "improved" certain employee benefits by offering the possibility for merit salary increases, it remains a matter of opinion whether this offsets the newspaper's decision to discontinue its program matching the employees' 401(k) contributions.

## III

### CONCLUSION

■ Ampersand has failed to show good cause for discovery delaying Paterno's anti-SLAPP motion. Forcing Paterno to submit to discovery in the absence of good cause jeopardizes the protections afforded by the anti-SLAPP statute against harassing litigation. To avoid this irreparable harm, we grant the petition and issue a writ to allow the anti-SLAPP statute to serve its intended purposes. (*Britts, supra*, 145 Cal.App.4th at pp. 1129–1130; *Garment Workers, supra*, 117 Cal.App.4th 1156.)

■ Paterno asks for her attorney fees in preparing this writ petition. Under subdivision (c) of the anti-SLAPP statute, successful litigants who prevail on a special motion to strike are entitled to attorney fees as a matter of right "to compensate . . . for the expense of responding to a SLAPP suit." (*Wanland v. Law Offices of Mastagni, Holstedt & Chiurazzi* (2006) 141 Cal.App.4th 15, 22 [45 Cal.Rptr.3d 633].) The trial court should consider Paterno's request for attorney fees in connenction with Paterno's special motion to strike.

Let a peremptory writ of mandate issue directing respondent superior court to vacate its discovery order of April 24, 2007, granting Ampersand's motion to conduct limited discovery and to issue a new and different order denying the motion. Paterno is awarded her costs in this proceeding.

Rylaarsdam, Acting P. J., and Ikola, J., concurred.