Filed 8/2/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JOHN DOE 2, | B269087 |
| Petitioner, | (Los Angeles County Super. Ct. No. BC575833) |
| v. | |
| THE SUPERIOR COURT OF LOS ANGELES COUNTY, | |
| Respondent; | |
| AVONGARD PRODUCTS U.S.A. LTD., | |
| Real Party in Interest. | |

PETITION for writ of mandate. Terry A. Green, Judge. Petition granted.

Gerard Fox Law and Morgan E. Pietz for Petitioner.

No appearance for Respondent.

Greenberg Glusker Fields Claman & Machtinger, Bonnie E. Eskenazi, Jonathan B. Sokol and Elizabeth Sbardellati for Real Party in Interest.

_____

Avongard Products U.S.A. Ltd., doing business as Hydraulx (Hydraulx), a preeminent film industry visual special effects (vfx) provider, sued petitioner John Doe 2 (Doe 2) for libel, alleging Doe 2's anonymous emails to a film producer and a film industry executive harmed its reputation. After Doe 2 filed a special motion to strike under California's anti-SLAPP statute, Code of Civil Procedure section 425.16, the trial court granted Hydraulx's request to conduct special discovery that would reveal Doe 2's identity.[1] Doe 2 filed a petition for writ of mandate seeking reversal of the discovery order.

We grant the petition. Under *Krinsky v. Doe 6* (2008) 159 Cal.App.4th 1154 (*Krinsky*), First Amendment protection for anonymous speech requires a libel plaintiff seeking to discover an anonymous libel defendant's identity to make a prima facie showing of all elements of defamation. *Paterno v. Superior Court* (2008) 163 Cal.App.4th 1342 (*Paterno)* similarly holds that a libel plaintiff cannot establish good cause for special discovery under section 426.16, subdivision (g) without a prima facie showing the allegedly libelous statements are false and unprivileged.

Hydraulx failed to make a prima facie showing that Doe 2's emails are provably false and defamatory statements of fact or that the emails caused Hydraulx to suffer actual damage. We therefore issue a writ of mandate ordering the trial court to vacate its discovery order and issue a new order denying Hydraulx's special discovery motion.

**FACTUAL BACKGROUND**

Hydraulx is a leading visual effects designer that provided visual effects services for successful feature films such as *The Avengers* and *Terminator 3*; advertising for large corporations such as Coca-Cola, Inc. and Ford Motor Company; and music videos for famous pop and rock music stars including Jennifer Lopez, Britney Spears, Usher, Aerosmith and U2, among others.

---

[1] Further statutory references are to the Code of Civil Procedure unless otherwise stated.

In 2010, Hydraulx was embroiled in a highly publicized dispute with Sony Pictures (Sony), arising out of Hydraulx's alleged conflict of interest in producing the motion picture *Skyline*, while simultaneously providing vfx services for Sony's film, *Battle: Los Angeles*. Both *Skyline* and *Battle: Los Angeles* involved a similar theme—an alien invasion of Los Angeles—and Hydraulx's scheduled release of *Skyline* in November 2010—just a few months before Sony released *Battle: Los Angeles* in March 2011—led to accusations by Sony that Hydraulx had used Sony's equipment and resources to produce the movie in violation of the companies' vfx agreement. After Sony sued Hydraulx in arbitration, news articles reported Sony's contention that "Hydraulx concealed the competitive nature of their project [*Skyline*]." Sony dropped the arbitration shortly after releasing *Battle: Los Angeles* in March 2011, reportedly " 'satisfied its special effects were not used' " in *Skyline*.

Doe 2 is an anonymous individual who sent two substantially identical emails to business associates of Hydraulx in August 2015. The emails were sent from Google Inc.'s web-based email service, Gmail, and identified the sender as "Greg Baktor" with the email address "vfx.recruits@gmail.com." Doe 2 sent one email to Lori Furie, an executive at Sony involved in Sony's movie project *Goosebumps*, and the other to Neil Moritz, a producer who worked on *Goosebumps* and Sony's earlier production, *Battle: Los Angeles*.[2] The email to Moritz read:

---

[2]    "Goosebumps" refers to a motion picture produced by Sony based on the series of children's novels written by author R.L. Stein. As noted, Moritz worked with Sony executive, Furie, on *Goosebumps* and an earlier film project, *Battle: Los Angeles*.

"I hoped I might whistle-blow on Vitality Visual Effects and Hydraulx. I was surprised to see 'Goosebumps' on Vitalitys [*sic*] IMDB[3] as Vitality is co-owned by Greg and Colin Strause of Hydraulx and I thought neither you nor Sony had[4] a good relationship with the Brothers after Skyline/Battle L.A.

"Vitality and Hydraulx share owners (Greg & Colin), their Exec Guy Botham works for both companies - Vitality and Hydraulx even share L.A. and Vancouver offices, hardware, and infrastructure.

"If Vitality misinformed you or Sony as to its ownership or profit participants in any way, please take my email into consideration.

"I am a concerned vfx professional whom, myself, has been burned by Greg and Colin and I do not like people perpetuating what I consider bad business practices.

"Thank you for your time in reading. I hope this email helps.

"Regards,

"A concerned VFX recruit."

Moritz forwarded the email to a Hydraulx client, visual effects producer Greg Baxter, who worked with Furie and Moritz on the *Goosebumps* film. Baxter responded:

"Not sure this is true. [¶] As I understand it, Guy [Botham] bought the hardware and software from (now defunct) Hydraulx. [¶] Strause Brothers, I was told, have zero involvement in Vitality, other than selling Guy their equipment and pipeline. [¶] I'll confirm with Guy."

Baxter forwarded the email to Guy Botham, Vitality's CEO, and Greg Strause, who co-owns Hydraulx with his brother, Colin Strause.

---

3    "IMDB" refers to the Internet Movie Database, a well known entertainment industry website identifying the talent, crew, and entertainment companies working on motion picture projects.

4    The email to Furie stated, "I thought Sony *did not have* a good relationship . . . ." (Italics added.) Otherwise the emails are identical.

## PROCEDURAL HISTORY

1.      *Hydraulx's Complaint for Defamation*

When Doe 2 sent the emails at issue in this writ petition, Hydraulx was already engaged in a law suit for defamation against several other anonymous individuals, fictitiously named in its March 2015 complaint as Does 1 through 10.  The complaint alleged that Doe 1, "with the material assistance of Does 2 through 10," used a pseudonym and a private email account "to send a November 7, 2014 email to the motion picture studio with which Hydraulx is presently engaged" describing Hydraulx as " 'on the verge of financial collapse.' "  The email asserted Hydraulx was " 'running on life support with a skeleton crew,' " while it " 'missed payroll' " and had its " 'resources consumed by many personal expenditures and various independent film projects.' "

Several months after Hydraulx filed suit, Doe 2 sent his August 2015 emails to Furie and Moritz.  Based on those emails, Hydraulx amended its complaint to add allegations against Doe 2.

Doe 2 filed a special motion to strike the complaint under the anti-SLAPP statute, section 425.16.[5]  Hydraulx responded by filing a special discovery motion under section 425.16, subdivision (g) seeking to discover Doe 2's identity by taking his deposition and enforcing a subpoena directed to Google, Inc., the operator of Doe 2's Gmail account.[6]

2. *Hydraulx's Special Discovery Motion*

Relying on the *Paterno* court's holding that a prima facie showing of libel is sufficient to entitle a plaintiff to special discovery under the anti-SLAPP statute (see *Paterno, supra,* 163 Cal.App.4th at p. 1349), Hydraulx sought to demonstrate Doe 2's statements were provably false by submitting declarations from Greg Strause and Guy

---

[5]      Doe 2 learned of the lawsuit after receiving notice from Google, Inc. that Hydraulx had subpoenaed records related to the Gmail account used to transmit the August 2015 emails.

[6]      The anti-SLAPP statute stays all discovery pending determination of the special motion to strike but allows the court to "order that specified discovery be conducted" upon "noticed motion and good cause shown."  (§ 425.16, subd. (g).)

Botham attesting to the independent ownership of Hydraulx and Vitality. Addressing Doe 2's statement, "Vitality is co-owned by Greg and Colin Strause of Hydraulx," Greg Strause declared, "Hydraulx does not now own and has never owned or controlled Vitality, a visual effects company owned and controlled by Guy Botham" and "neither I nor my brother . . . owns or has ever owned any interest in Vitality." Botham identified himself as the "sole shareholder, owner and operator" of two entities using the name Vitality Visual Effects: Vitality Visual Effects, Inc., a California Corporation, and Vitality Visual Effects Ltd., a British Columbia corporation, referring to them collectively as Vitality. Botham further declared, "[n]either Greg Strause, Colin Strause nor Hydraulx own, or have ever owned, any interest in Vitality."

Hydraulx also sought to establish the statements were defamatory in nature by emphasizing the word "whistle-blow" in the emails, which Greg Strause declared had the effect of "insinuating that Hydraulx has done something dishonest and/or is hiding something, which it has not." He also averred, "Hydraulx does not perpetuate bad business practices, but rather follows the industry standard," and "Hydraulx does not believe it has unfairly treated or 'burned' anyone in the visual effects community."

Hydraulx argued it needed to discover Doe 2's identity to oppose Doe 2's anti-SLAPP motion with evidence Doe 2 made false statements with actual malice and thereby demonstrate a probability of success on the merits of its defamation claim.[7] In that regard, Hydraulx maintained Doe 2's chosen pseudonym—"concerned vfx professional"—suggested the writer was likely a "partner (or former partner), vendor, employee (or former employee), consultant or competitor" of Hydraulx whose relationship to the company would demonstrate the email had been "motivated by evil intent." Hydraulx also argued Doe 2's identity was critical to a potential motion to

___

[7] When a defendant on an anti-SLAPP motion makes a threshold showing that a challenged cause of action is one arising from protected activity, the burden shifts to the plaintiff to demonstrate, with evidence, a probability of prevailing on the claim. If the defendant fails to meet this evidentiary burden, a claim arising from protected activity will be stricken. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88-89; § 425.16, subd. (b)(1).)

6

compel arbitration, citing Greg Strause's declaration that "Hydraulx has agreements to arbitrate with nearly all of its partners, vendors, employees, consultants and clients."

  3. *Doe 2's Opposition to the Special Discovery Motion*

  Doe 2 argued, in opposition, that Hydraulx could not discover his identity without making a prima facie showing on every element of its libel claim *except* those elements, such as actual malice, that required evidence inaccessible to Hydraulx. Doe 2 argued that each statement in the emails was non-actionable as a matter of law either because it was not "of and concerning" Hydraulx or it was substantially true. Doe 2 also argued that his statements about "bad business practices" and being "burned" were expressions of constitutionally protected opinion. To provide context for his argument that the emails were not defamatory, Doe 2 submitted news articles and internet postings about the Strause brothers' high profile careers, the *Skyline/Battle: Los Angeles* controversy and Hydraulx's alleged failure to compensate vfx professionals in compliance with wage and hour laws.

  To demonstrate the truth of his statement concerning Hydraulx's and Vitality's joint ownership, Doe 2 submitted online profiles for five professionals who identified themselves as working for Hydraulx and Vitality and an IMDB resume for Guy Botham listing his companies as Hydraulx and Vitality Visual Effects. Doe 2 also submitted records from the Nevada Secretary of State's website identifying David and Linda Strause as the managing members of a third entity with Vitality Visual Effects in its name, Vitality Visual Effects LLC, and records from the Illinois Secretary of State's website identifying Hydraulx as an Illinois corporation with the same principal officers, David and Linda Strause. Doe 2 identified David and Linda Strause as Greg and Colin Strause's parents, and argued that the records from these state agencies demonstrated the substantial truth of his allegation that Hydraulx and Vitality were co-owned by the Strause family.

  Finally, to blunt the charge that Hydraulx needed to know his identity to establish malice, Doe 2 offered the concession that Hydraulx "should be excused from having to make a preliminary prima facie showing as to those elements of the claim for defamation

7

where the relevant facts would identify Doe 2 and are out of [Hydraulx]'s control." Thus, Doe 2 continued, "[Hydraulx] will not have to produce evidence as to actual malice on the part of Doe 2." Doe 2 maintained this approach was consistent with the procedure established in *Krinsky* for balancing the plaintiff's right to seek redress for statements it claims amount to defamation and the speaker's First Amendment right to speak anonymously. (See *Krinsky, supra,* 159 Cal.App.4th at p. 1172.)

4. *The Hearing on the Special Discovery Motion*

After hearing extensive argument from both sides, the trial court granted Hydraulx's motion for special discovery. The court reasoned that the word "whistle-blow" "impli[ed] civil or criminal wrongdoing," which could support a finding of defamation. Further, the court found all statements in Doe 2's emails "[were] capable of being proven true [or] false." Weighing the due process concerns attendant to making plaintiffs "prove a fact that they don't have access to," the court concluded Hydraulx had made a sufficient prima facie showing of libel to obtain special discovery that would reveal Doe 2's identity.

5. *Doe 2's Petition for Writ of Mandate*

Doe 2 filed a petition for writ of mandate and request for immediate stay of the discovery order with this court. On December 29, 2015, we issued a temporary stay order pending determination of the petition. On February 20, 2016 we issued an order to show cause inviting additional briefing and setting the matter for hearing.

**STANDARD OF REVIEW**

We review the trial court's ruling on a discovery motion for abuse of discretion. However, because the relevant facts are undisputed, we review the trial court's exercise of discretion as a question of law. (*Krinsky, supra,* 159 Cal.App.4th at p. 1161.) Because Doe 2 invokes the protection of the First Amendment, we also conduct an independent review. (*Ibid.*) When called upon to draw " 'the line between speech unconditionally guaranteed and speech [that] may legitimately be regulated,' " we " 'examine for ourselves the statements in issue and the circumstances under which they were made to see . . . whether they are of a character which the principles of the First Amendment, as

8

adopted by the Due Process Clause of the Fourteenth Amendment, protect.' " (*New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 285, quoting *Pennekamp v. Florida* (1946) 328 U.S. 331, 335.)

## DISCUSSION

1.     *Hydraulx Must Make a Prima Facie Showing under Krinsky and Paterno*

Like *Krinsky*, this case presents a conflict between a plaintiff's right to employ the judicial process to discover the identity of an allegedly libelous speaker and the speaker's First Amendment right to remain anonymous. As explained in *Krinsky,* "[j]udicial recognition of the constitutional right to publish anonymously is a long-standing tradition. . . . 'Persecuted groups and sects from time to time throughout history have been able to criticize oppressive practices . . . either anonymously or not at all.' [Citation.] 'The decision in favor of anonymity may be motivated by fear of economic or official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible. Whatever the motivation may be, at least in the field of literary endeavor, the interest in having anonymous works enter the marketplace of ideas unquestionably outweighs any public interest in requiring disclosure as a condition of entry.' " (*Krinsky, supra,* 159 Cal.App.4th at p. 1163.)

Notwithstanding the constitutional right to anonymity, the *Krinsky* court acknowledged that a libel plaintiff has a legitimate competing interest in discovering an anonymous speaker's identity in order to effectively prosecute the libel claim. (*Krinsky, supra,* 159 Cal.App.4th at p. 1165.) After surveying standards adopted by other states addressing these competing rights and interests, the *Krinsky* court articulated a rule of general application.

Balancing the longstanding First Amendment right to publish anonymously with a libel plaintiff's right to prosecute her case, the *Krinsky* court determined that a libel plaintiff seeking to compel disclosure of an anonymous speaker's identity must (1) give notice to the anonymous speaker and (2) "make a prima facie showing of the elements of libel," limited to "only those material facts that are accessible to [the plaintiff]." (*Krinsky, supra,* 159 Cal.App.4th at pp. 1171-1172.) Recognizing that certain elements

9

of a libel claim, such as actual malice, may be difficult to establish without knowing the defendant's identity, the court limited the requisite prima facie showing to evidence accessible to a libel plaintiff. (*Id.* at pp. 1171-1172 & fn. 12.) With this accommodation, *Krinsky* concluded the burden "should not be insurmountable [where] plaintiff knows the statement that was made and [can] produc[e] evidence of its falsity and the effect it had on her." (*Id.* at p. 1172.)

In *Paterno*, the court explained that the prima facie showing required under *Krinsky* is consistent with the prima facie showing required of a libel plaintiff seeking special discovery under section 425.16, subdivision (g), to oppose an anti-SLAPP motion subject to the constitutional malice standard. Citing the "self-executing protections of the First Amendment" and *Krinsky's* requirement that the "discovery proponent . . . make a prima facie showing the . . . statement was libelous," *Paterno* held that "plaintiffs who bring defamation actions subject to the constitutional malice standard cannot show good cause [under section 425.16, subdivision (g)] for discovery on the question of actual malice without making a prima facie showing that the defendant's published statements contain provably false factual assertions." (*Paterno, supra,* 163 Cal.App.4th at p. 1349.) Thus, consistent with *Krinsky*, the *Paterno* court held a libel plaintiff may not obtain special discovery under the anti-SLAPP statute (see fn. 7, ante) without first making a prima facie showing of the elements of libel for which the material facts are available to the plaintiff. (*Paterno*, at pp. 1349-1351; see also *The Garment Workers Center v. Superior Court* (2004) 117 Cal.App.4th 1156, 1162 ["Even if it looks as if the defendant's actual malice may be an issue in the case, if it appears from the SLAPP motion there are significant issues as to falsity or publication—issues which the plaintiff should be able to establish without discovery—the court should consider resolving those issues before permitting what may otherwise turn out to be unnecessary, expensive and burdensome discovery proceedings"].)

2. *A Prima Facie Showing of Libel Requires Proof of a Provably False Assertion of Fact That Is Susceptible of a Defamatory Meaning*

Libel is a form of defamation effected in writing. (*Paterno, supra,* 163 Cal.App.4th at p. 1349; Civ. Code, § 44.) "The elements of a defamation claim are (1) a publication that is (2) false, (3) defamatory, (4) unprivileged, and (5) has a natural tendency to injure or causes special damage." (*Wong v. Jing* (2010) 189 Cal.App.4th 1354, 1369.) The defamatory statement must specifically refer to, or be " 'of and concerning,' " the plaintiff. (*Blatty v. New York Times Co.* (1986) 42 Cal.3d 1033, 1042.)

It is the province of the court to determine whether a statement is actionable as a statement of fact susceptible of a defamatory meaning, versus a non-actionable statement of opinion privileged under the First Amendment. "[I]t is a question of law for the court whether a challenged statement is reasonably susceptible of an interpretation which implies a provably false assertion of actual fact. If that question is answered in the affirmative, the jury may be called upon to determine whether such an interpretation was in fact conveyed." (*Kahn v. Bower* (1991) 232 Cal.App.3d 1599, 1608 (*Kahn*); *Gregory v. McDonnell Douglas Corp.* (1976) 17 Cal.3d 596, 601 (*Gregory*).)

A court construing an allegedly defamatory statement must consider the statement in the context in which it was made. "In determining whether statements are of a defamatory nature, and therefore actionable, ' "a court is to place itself in the situation of the hearer or reader, and determine the sense or meaning of the language of the complaint for libelous publication according to its natural and popular construction." That is to say, the publication is to be measured not so much by its effect when subjected to the critical analysis of a mind trained in the law, but by the natural and probable effect upon the mind of the average reader.' " (*Morningstar, Inc. v. Superior Court* (1994) 23 Cal.App.4th 676, 688.)

"In determining the meaning of a communication, words, whether written or spoken, are to be construed together with their context. Words which standing alone may reasonably be understood as defamatory may be so explained or qualified by their context as to make such an interpretation unreasonable. So too, words which alone are innocent

may in their context clearly be capable of a defamatory meaning and may be so understood.  The context of a defamatory imputation includes all parts of the communication that are ordinarily heard or read with it. . . . [T]he entire contents of a personal letter are considered as the context of any part of it because a recipient of the letter ordinarily reads the entire communication at one time."  (Rest.2dTorts, § 563, com. d, p. ___.)

"Under the First Amendment there is no such thing as a false idea."  (*Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323, 339.)  Hence, statements of opinion can never subject the speaker to liability for making a false and defamatory statement.  As the United States Supreme Court explained in *Gertz,* "However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas."  (*Id.* at pp. 339-340.)

Consistent with *Gertz,* California courts have repeatedly held statements of opinion are protected by the First Amendment.  Thus, to be actionable, an allegedly defamatory statement must make an assertion of fact that is provably false.  "The question is whether the statement is provably false in a court of law."  (*Weller v. American Broadcasting Companies, Inc.* (1991) 232 Cal.App.3d 991, 1006.  As our Supreme Court noted in *Gregory*, the critical distinction between "whether the allegedly defamatory statement constitutes fact or opinion is . . . frequently a difficult one, and what constitutes a statement of fact in one context may be treated as a statement of opinion in another, in light of the nature and content of the communication taken as a whole."  (*Gregory, supra,* 17 Cal.3d at p. 601.)  The test, in California, to determine whether an allegedly defamatory statement is fact or opinion is a " 'totality of the circumstances' " test.  (*Baker v. Los Angeles Herald Examiner* (1986) 42 Cal.3d  254, 261 (*Baker*).)

In *Milkovich v. Lorain Journal Co.* (1990) 497 U.S. 1 (*Milkovich),* the United States Supreme Court considered whether statements in a newspaper editorial about an altercation at a wrestling match were actionable statements of fact defaming the wrestling coach or protected expressions of opinion. It concluded the statement—" ' "Anyone who attended the meet . . . knows in his heart that [coach] Milkovich . . . lied at the hearing after [giving] his solemn oath to tell the truth" ' "—was actionable because it implied a provably false statement of fact—that Milkovich lied under oath. (*Id.* at pp. 5, 21.) In so holding, the *Milkovich* court reasoned that "expressions of 'opinion' may often imply an assertion of objective fact." (*Id.* at p. 18) For example, the statement, " 'In my opinion John Jones is a liar' . . . 'implies a knowledge of facts which lead to the conclusion Jones told an untruth.' " (*Ibid.*)

On the other hand, when a communication identifies non-defamatory facts underlying an opinion, or the recipient is otherwise aware of those facts, a negative statement of opinion is not defamatory. As explained in the Restatement Second of Torts, a "pure type of expression of opinion" occurs "when both parties to the communication know the facts or assume their existence and the comment is clearly based on those assumed facts and does not imply the existence of other facts in order to justify the comment. The assumption of the facts may come about because someone else has stated them or because they were assumed by both parties as a result of their notoriety or otherwise." (Rest.2d Torts, § 566, com. b, p. 171.) Actionable statements of opinion are "the mixed type, [where] an opinion in form or context, is apparently based on facts regarding the plaintiff or his conduct that have not been stated by the defendant [but] gives rise to the inference that there are undisclosed facts that justify the forming of the opinion."[8] (*Ibid.*)

---

[8] The Restatement Second of Torts, section 566, comment c provides several examples of actionable and non-actionable statements of opinion: "3. A writes to B about his neighbor C: 'I think he must be an alcoholic.' A jury might find that this was not just an expression of opinion but that it implied that A knew undisclosed facts that would justify this opinion. [¶] 4. A writes to B about his neighbor C: 'He moved in six months ago. He works downtown, and I have seen him during that time only twice, in his

13

A court distinguishing between statements of fact and protected statements of opinion must consider the effect of cautionary language in an allegedly defamatory communication. "Where the language . . . is 'cautiously phrased in terms of apparency' the statement is less likely to be reasonably understood as a statement of fact rather than opinion." (*Baker, supra,* 42 Cal.3d at pp. 260-261, fn. omitted.) Thus, in *Gregory*, the court focused on the word, "apparently" to determine that the statement—" '*Apparently* there were some internal politics within [the union] which certain individuals were using to seek personal gain and political prestige rather than to serve the best interests of the members they were supposed to represent' "—was opinion rather than fact. (*Gregory, supra,* 17 Cal.3d at p. 599, italics added.) Likewise, in *Baker*, the court observed the phrase " '[m]y impression is . . . .' " would signal to a reasonable person that "a statement of opinion rather than of fact was to follow." (*Baker,* at pp. 261-262; see also, *Carr v. Warden* (1984) 159 Cal.App.3d 1166, 1168-1170 [statement premised by "I think . . . ." was not a defamatory statement of fact].)

With these principles in mind, we turn to whether the evidence presented by Hydraulx established a prima facie case as to those elements of libel for which Hydraulx had access to relevant material facts.

3.    *Doe 2's Statements Did Not Assert or Imply Provably False Statements of Fact That, in Context, Are Susceptible of a Defamatory Meaning*

Hydraulx contends, and the trial court concluded, Doe 2's use of the word "whistle-blow" and statements that he was "burned by Greg and Colin" and "does not like people perpetuating what [he] consider[s] bad business practices" are provably false

backyard around 5:30 seated in a deck chair with a portable radio listening to a news broadcast, and with a drink in his hand. I think he must be an alcoholic.' The statement indicates the facts on which the expression of opinion was based and does not imply others. These facts are not defamatory and A is not liable for defamation. [¶] 5. A says to B about C, a city official: 'He and his wife took a trip on city business a month ago and he added her expenses in as a part of his own.' B responds: 'If he did that he is really a thief.' B's expression of opinion does not assert by implication any defamatory facts, and he is not liable to C for defamation." (Rest.2dTorts, § 566, com. c, illus. 3-5, p. ___.)

14

and defamatory.  We disagree.  In the context in which they were made, Doe 2's statements are not reasonably susceptible of an interpretation implying defamatory statements of fact beyond the facts disclosed in the emails or known to the recipients.

The trial court expressed a concern that "in the language of the law," "whistleblower" implied Hydraulx engaged in criminal or wrongful conduct:  "People don't whistle-blow fun, nice things that are meaningless.  People whistle-blow wrongdoing. . . .  And the word whistle-blow . . . causes me to read it in a different light."  While we agree that, in the context of litigation, the term "whistle-blow" can imply an allegation of criminal or wrongful conduct, we must consider the word in the context of Doe 2's emails and measure its use "not so much by its effect when subjected to the critical analysis of a mind trained in the law, but by the natural and probable effect upon the mind of [the] reader."  (*MacLeod v. Tribune Publishing Co.* (1959) 52 Cal.2d 536, 547.)

The specific wording of the emails, and the order in which the information is communicated, are instructive.  Doe 2 opened his emails with cautionary language, saying, "I *hoped* I *might* whistle-blow on Vitality Visual Effects and Hydraulx." (Italics added.)  The words "hoped" and "might" before "whistle-blow" signal that Doe 2 is using the term hyperbolically to introduce a communication of specific information that the recipients may not know.  In context, the term explains why he is writing and introduces the information about Vitality and Hydraulx's supposed shared ownership, which, in and of itself, is not defamatory.[9]

---

[9] Although Greg Strause's and Bothman's declarations were sufficient to make a prima facie showing of falsehood with respect to the statements associating Hydraulx with Vitality, the allegation of common ownership is not defamatory on its face and Hydraulx has not offered any extrinsic facts supporting a defamatory innuendo.  To the contrary, because Hydraulx's complaint and declarations portray both companies in a positive light, there is no indication that the inaccurate attribution of common ownership was defamatory.

In the next statements, Doe 2 goes on to explain the impetus for the communication, describing that he "was surprised to see 'Goosebumps' on Vitality's IMDB as Vitality is co-owned by Greg and Colin Strause of Hydraulx . . . ." Doe 2 continues in the same vein, explaining why he was surprised ("I thought neither you nor Sony had a good relationship with the Brothers after Skyline/Battle L.A") referring to Sony's highly publicized accusation that Hydraulx failed to disclose its conflict of interest in working on *Skyline* while under contract to Sony for *Battle: Los Angeles.*

After identifying the basis for his assumption about continuing bad relations between Sony and Hydraulx, Doe 2 started a new paragraph to recite his non-defamatory allegations of common ownership (see fn. 9, *ante*): "Vitality and Hydraulx share owners (Greg and Colin), their Exec Guy Botham works for both companies - Vitality and Hydraulx even share L.A. and Vancouver offices, hardware, and infrastructure." Referring to that disclosure, Doe 2's next paragraph was about Vitality (not Hydraulx) and expressly refrained from accusing Vitality of any failure to disclose: "*If* Vitality misinformed you or Sony as to its ownership or profit participants in any way, please take my email into consideration." (Italics added.) This paragraph communicates no false or defamatory facts "of and concerning" Hydraulx.

To close the emails, Doe 2 communicated additional information about himself, again explaining his motivation for contacting the recipients. Writing in the first person, Doe 2 described himself as "a concerned vfx professional whom, myself, has been burned by Greg and Colin and I do not like people perpetuating what I consider bad business practices." Doe 2 then thanked the recipients for their "time in reading" and expressed his "hope this email helps" before signing off as a "concerned VFX recruit."

There is no dispute that the recipients knew about the prior conflict between Sony and Hydraulx. Because they read the emails in the context of known facts about that conflict, the conflict is important to the determination whether the emails are reasonably susceptible of a defamatory meaning. "In determining the meaning of a communication, account is to be taken of all the circumstances under which it is made so far as they were known to the recipient. Words which if isolated from the circumstances under which

16

they were uttered might appear defamatory, may in fact not have been so understood by the person to whom they were published.  (Rest.2dTorts, § 563, com. e, p. ___.)

The gist of the various news articles describing the 2011 dispute between Sony (the company that retained Vitality for visual special effects services on its *Goosebumps* project) was that Sony perceived that Hydraulx had a conflict of interest working on *Skyline* while under contract for *Battle: Los Angeles* and was surprised and angry about it.  That context explained the impetus for Doe 2's uninvited emails about the potential for a new conflict of interest and Doe 2's expressed distaste for such business practices.

Hydraulx argues that Doe 2's offer to "whistle-blow" and references to "bad business practices" and being "burned" imply a defamatory accusation Hydraulx engaged in dishonesty or wrongful conduct beyond the conflicts of interest addressed in the emails.[10]  We find that in context, the term "whistle-blow" was used hyperbolically to introduce the disclosed and non-defamatory allegation of common ownership and that Doe 2's reference to "bad business practices" reasonably referred to the known or disclosed facts: Hydraulx's *Skyline* conflict of interest and Vitality's potential conflict if it failed to disclose common ownership.  In context, the only reasonable interpretation of "bad business practices" is in reference to facts known to the recipients of the emails (Hydraulx's prior conflict of interest) and facts disclosed in the emails (the false allegation of common ownership and Vitality's potential conflict of interest involving *Goosebumps*.)

---

[10]     Hydraulx argues in the alternative that Doe 2's statements are not entitled to the degree of First Amendment protection afforded opinions because the statements constitute commercial speech.  Hydraulx infers that as a "vfx professional" Doe 2 is necessarily a competitor.  Although that inference is belied by Doe 2's further admission he is a VFX *recruit,* Hydraulx's commercial speech argument has no merit.  As noted in *Central Hudson Gas & Elect. v. Public Serv. Comm'n*, 447 U.S. 557, the diminished protection for commercial speech applies to " ' "speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation." ' " (*Id.* at p. 589.)  Doe 2's emails do not propose a commercial transaction.  They are not an advertisement for services.  Based on the content of the communications, there is no reason to vitiate Doe 2's right to speak freely and to remain anonymous.

17

Hydraulx's libel allegations are not based on Doe 2's statements about conflicts of interest. (Cf. *Savage v. Pacific Gas & Electric Co.* (1993) 21 Cal.App.4th 434, 445 [concluding statements about conflicts of interest inevitably involve "an application of an ethical standard to facts, reflecting the exercise of judgment" that "[do] not imply an objective fact that can be proved to be true or false"].) Instead, Hydraulx argues that the terms "whistle-blow," "bad business practices" and being "burned" communicated or implied that Hydraulx engaged in some other undisclosed conduct involving dishonesty. As noted above, we do not find the emails reasonably susceptible of such an interpretation.

Even if they were, the onus was on Hydraulx to introduce evidence that the recipients of the emails interpreted them as accusations of wrongful conduct beyond the conflicts of interest. (See *Kahn, supra,* 232 Cal.App.3d at p. 1608 [if court finds statements are susceptible of a defamatory meaning, "the jury may be called upon to determine whether such an interpretation was in fact conveyed" to the recipients].) Hydraulx offered no evidence that Moritz, Furie, Baxter, or Botham interpreted the emails as implying an accusation that Hydraulx engaged in any misconduct, aside from the actual and potential conflicts of interest. (See *Krinsky, supra,* 159 Cal.App.4th at pp. 1171-1172; *Paterno, supra,* 163 Cal.App.4th at pp. 1349-1351.) Although Botham, in his declaration, averred that the allegation of common ownership was false, he did not say that he understood the emails as conveying any defamatory information or implying any undisclosed facts about Hydraulx.

Neil Moritz's comments when he forwarded an email "FYI" to Greg Baxter suggests that he did not view the email as defamatory. Baxter's response—"Not sure this is true. [¶] . . . Guy [Botham] bought the hardware are software from (now defunct) Hydraulx. [¶] Strause Brothers, I was told, have zero involvement in Vitality, other than selling Guy their equipment and pipeline"—also offers no indication that Baxter read the email as communicating anything other than the non-defamatory allegation of common ownership. The record is therefore devoid of any evidence the recipients of the emails

18

interpreted them as an accusation Hydraulx engaged in any deceit or wrongdoing aside from the conflict of interest with Sony identified in Doe 2's emails.[11]

Outside the context of the conflicts of interest, the words "whistle-blow" "bad business practices" and "burned" are too vague and amorphous to constitute an accusation of specific wrongdoing. In *McGarry v. University of San Diego* (2007) 154 Cal.App.4th 97, the court rejected the plaintiff's argument that a similarly vague implication he engaged in immoral conduct was actionable as an opinion based on an undisclosed statement of false and defamatory facts. The court held a statement "impliedly assert[ing] [the plaintiff] had engaged in some unspecified immoral behavior . . . [was] incapable of being interpreted as implying a *provably false* assertion of *fact*." (*Id.* at p. 116.) The court explained, "Behavior that might qualify as immoral to one person, although being perfectly acceptable to another person, demonstrates that an amorphous assertion of immoral behavior is within the range of statements of opinion that are not actionable." (*Id.* at p. 117.) "Because [defendant's] statement contain[ed] no hint of what conduct she believed [the plaintiff] had engaged in that would be immoral, her statement neither contained nor implied a provably false assertion of fact, but at most implied an opinion." (*Ibid.*)

The same is true in this case because behavior one person regards as a "bad business practice" may be acceptable to another person and conduct causing one person to feel "burned" may not affect another person at all. Someone might regard something as trivial as failures to return telephone calls as "bad business practices." Another person

---

[11]    Along the same lines, Hydraulx also failed to offer evidence that the statements caused harm. Though Hydraulx argued in its motion that the reference to "bad business practices" was a libel per se for which damages may be presumed, the United States Supreme Court has held that a presumption of damages is inconsistent with the First Amendment when a public figure libel plaintiff alleges defamation based on statements concerning a matter of public interest. (*New York Times Co. v. Sullivan, supra,* 376 U.S. at pp. 283-284.) Hydraulx premised its motion for special discovery on its need to discover Doe 2's actual malice. Although, as a libel plaintiff subject to proof of actual malice, Hydraulx also had to prove actual damages, it did not plead or offer proof that Doe 2's emails caused it to suffer any harm.

19

might use "bad business practices" to describe fraudulent or unlawful conduct.  Similarly, a  person might feel "burned" by any range of behavior, from a social snub to a fraudulent transaction.  Without some reference to the type of undisclosed misconduct, e.g., "In my opinion, John Jones is a liar," these comments are too vague and uncertain to be actionable as conveying a defamatory accusation.  (*Milkovich, supra,* 497 U.S. at pp. 19-20; see, e.g.,  *Nygård, Inc. v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1047 [employee's statements about " ' "horrible working experience" ' " with prominent business man, being pestered "around-the-clock" and "[slaving] without a break" are protected opinion about employer]; *Moyer v. Amador Valley J. Union High School Dist.* (1990) 225 Cal.App.3d 720. 722 [statement that plaintiff was the " 'worst' " teacher, " 'babble[d]' " and was terrorized when a smoke bomb went off in his class were non-actionable opinions].)

This interpretation is supported by Doe 2's extensive use of cautionary language, emphasizing his communication of opinions rather than facts.  The emails open with, "I *hoped* I *might* whistle-blow," vitiating any implication that he intended to make an accusation of dishonesty or wrongdoing.  His statement, "I *thought* neither you nor Sony had a good relationship" underscores that his understanding about the relationship was not certain or based on any first-hand knowledge.  Doe 2 was careful not to accuse Vitality of dishonesty.  His statement, "*If* Vitality *misinformed* you . . ." declines to make an accusation of dishonesty; the verb "misinform" rather than "lie" or "defraud" leaves open the possibility of a negligent rather than intentional miscommunication.  Doe 2 makes no statement suggesting Hydraulx had been dishonest in connection with *Goosebumps*, or had a new conflict of interest or duty to disclose its supposed relationship with Vitality.

Doe 2 is even more cautionary in his statement about "bad business practices," inviting the reader to reject his allegation based on his admitted bias against the Strause brothers—i.e., "I . . . myself [have] been burned."  His reference to himself twice in the statement, "*I do not like* people perpetuating *what I consider bad* business practices," underscores his intention to communicate a personal opinion rather imply an objective

and defamatory accusation of fact. (Cf. *Gregory, supra,* 17 Cal.3d at p. 599; *Baker, supra,* 42 Cal.3d at p. 262. "Opinions that present only an individual's personal conclusions and do not imply a provably false assertion of fact are nonactionable." (*Paterno, supra,* 163 Cal.App.4th at p. 1356.)

Nothing in the emails suggests Doe 2 had any inside information about Hydraulx or professional expertise about industry business practices. As the Supreme Court explained in *Milkovich*, "[s]imply couching . . . statements in terms of opinion does not dispel [false and defamatory] implications" where the speaker implies "a knowledge of facts which lead to the [defamatory] conclusion." (*Milkovich, supra,* 497 U.S. at pp. 18, 19; cf. *Bose Corp. v. Consumer Union of U.S., Inc.* (1984) 466 U.S. 485 [sound engineer's opinion plaintiff's speakers generated sound that tended to "wander about the room" implied knowledge of underlying defamatory facts]; *Gill v. Hughes* (1991) 227 Cal.App.3d 1299, 1309 [hospital board's statement plaintiff surgeon was " 'incompetent' " and " 'needs more training' " actionable as implying undisclosed facts].)

There is no similar suggestion of superior knowledge or expertise in this case. By identifying himself as a "vfx professional" and signing off as a "VFX *Recruit,*" Doe 2 let the recipients of his emails know that he is a skilled worker who is new to the profession rather than an executive in a position of power or another person with inside knowledge. Doe 2's self-identification as a "recruit" also belied any suggestion he was an attorney or person with any particular knowledge about, or authority on, industry business practices. (Cf. *Franklin v. Dynamic Details, Inc.* (2004) 116 Cal.App.4th 375, 389 [non-attorney's charge that plaintiff "stole" and "plagiarized" copyright material were statements of protected opinion based on disclosed facts].)

We therefore conclude that Doe 2's emails are not actionable as libel because the expressed opinions are not reasonably susceptible of an interpretation implying any undisclosed false and defamatory fact "of and concerning" Hydraulx. Therefore, Hydraulx failed to make a prima facie showing of libel.

21

4. *The Possibility of an Arbitration Agreement Is Not an Adequate Basis for Compelling Discovery of Doe 2's Identity*

Hydraulx argues in the alternative that it is entitled to discovery of Doe 2's identity as a means of potentially enforcing an arbitration agreement that it contends it may have with Doe 2. The contention is entirely speculative and lacks a basis in substantial evidence. Though Greg Strause's declaration states, "Hydraulx has agreements to arbitrate with nearly all of its partners, vendors, employees, consultants and clients," Hydraulx provided no evidence of the contents of the supposed agreements, and made no showing that the agreements would apply to the circumstances of this case. Without evidence of the specific provisions, it is impossible to determine whether any Hydraulx arbitration agreement, even if signed by Doe 2, would be binding in this case.

*Krinsky*'s requirement that a libel plaintiff make a prima facie showing before invading a speaker's constitutional right to remain anonymous makes no exception for discovery pertaining to forum selection issues. Evidence that Hydraulx might have an arbitration agreement with Doe 2 that may or may not be enforceable is not evidence of a due process or contractual right sufficient to outweigh Doe 2's right to free expression and to protection under the First Amendment. Mindful that Hydraulx initiated this action and that Doe 2 has invoked the protection of the anti-SLAPP statute in an effort to avoid the expense of defending that lawsuit, we decline to make any exception to *Krinsky's* requirement, which was specifically calibrated to balance the libel plaintiff's right to due process in prosecuting his claim with the defendant's First Amendment right to speak anonymously.

## DISPOSITION

The petition is granted.  Let a writ of mandate issue directing the trial court to vacate its order granting Hydraulx's motion for special discovery under section 425.16, subdivision (g) and enter a new order consistent with this opinion.  The stay of proceedings in the trial court is lifted.  John Doe 2 is awarded his costs in this writ proceeding.

**CERTIFIED FOR PUBLICATION**


HOGUE, J.*


We concur:



EDMON, P. J.



ALDRICH, J.

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.