Filed 1/31/25  Mahoney v. Huang CA1/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| ANGELA LEE MAHONEY, as Administrator, etc., et al.,<br><br>      Plaintiffs and Respondents,<br><br>v.<br><br>YUANZHU HUANG,<br><br>      Defendant and Appellant. | A167189<br><br>(Alameda County<br>Super. Ct. No. 22CV015133) |

Defendant Yuanzhu Huang appeals from the trial court's order denying in part her special motion to strike (anti-SLAPP motion) under Code of Civil Procedure[1] section 425.16.  The court found the defamation claims asserted by plaintiffs Donald Lee and Donald Lee, DO doing business as Biz MedSpa (Biz MedSpa; collectively, plaintiffs) and most of their claims in their second cause of action for intentional interference with prospective economic advantage did not arise out of protected activity.[2]  The court further found

---

[1] Undesignated statutory references are to the Code of Civil Procedure unless otherwise stated.

[2] Several months after briefing in this appeal was complete, Huang filed a motion informing us that Lee died in February 2024 and seeking to substitute Angela Lee Mahoney, the administrator of Lee's estate, in the place of Lee.  Mahoney was made aware of this appeal in July 2024, and her

that plaintiffs established a probability of prevailing on the merits of their second cause of action. Finally, the court granted Huang's motion as to one of the claims in plaintiffs' third cause of action for intentional infliction of emotional distress but denied the motion as to the remaining claims.

On appeal, Huang contends the trial court erred because her statements giving rise to plaintiffs' causes of action concerned protected consumer information and complaints to a regulatory agency. Huang also argues plaintiffs cannot show a probability of prevailing on the merits of their claims.

We agree Huang met her burden of demonstrating that some of plaintiffs' defamation claims arose from protected activity. We further conclude the trial court should have granted Huang's anti-SLAPP motion as to certain claims in plaintiffs' second and third causes of action because Huang presented a prima facie showing that those claims arose from protected activity, and Lee did not establish a probability of prevailing on those claims. Accordingly, we affirm the court's order in part and reverse it in part. Because the court did not reach a decision regarding the second prong of the anti-SLAPP analysis as to plaintiffs' defamation claims, we remand the case for a determination of that issue.

## I. BACKGROUND

Lee is an osteopathic doctor and operates a business called Biz MedSpa that offers non-surgical facial aesthetic treatments. Huang and defendant Fang Wang were patrons of Lee's business. Plaintiffs alleged that defendants were mother and daughter.

---

attorneys were served with the substitution motion. We granted the unopposed motion on January 13, 2025. (Cal. Rules of Court, rule 8.36(a).)

## A. The Complaint

In July 2022, plaintiffs filed a lawsuit against Wang and Huang.  The complaint alleged that in June 2021, Wang received a facial treatment from Biz MedSpa.  Afterwards, she demanded a refund, which Lee refused.  Dissatisfied with Lee's response, defendants posted defamatory statements on at least two social media web sites, WeChat and The Little Red Book (or Redbook) over the span of several days attacking plaintiffs' reputation.  The complaint attributed many of the alleged statements to Wang but asserted that "any posts appearing to have been posted by . . . Wang were in fact posted by both" defendants.  As relevant to this appeal, the complaint asserted causes of action for "defamation/libel" (capitalization and boldface omitted), intentional interference with prospective economic advantage, and intentional infliction of emotional distress.

In support of their first cause of action for defamation/libel, plaintiffs alleged that the following statements posted by defendants on social media were false, defamatory, and unprivileged:  (1) plaintiffs performed a procedure " 'upside-down' " on Wang; (2) Biz MedSpa "would not inject the hyaluronic acid to the customers with the full amount that the customer purchased, but save some, and inject the rest of the hyaluronic acid to themselves or others"; (3) plaintiffs " 'reuse[] the disposable gloves and sponges' "; (4) they found " 'all the instruments are fake and come from Guangzhou, China' "; and (5) plaintiffs' " 'way of dealing with client complaints is to call the police and lawyers.' "[3]

---

[3] The complaint also alleged defendants made several false statements implying Lee was having an extramarital affair with one of his employees. Huang concedes those statements do not constitute protected activity, and thus they are not at issue in this appeal.

Plaintiffs asserted the same allegedly defamatory statements supported their second cause of action for intentional interference with prospective economic advantage. They further alleged that defendants attempted to interfere with their business by publishing posts on social media falsely implying that their services were worthless and asserting that Wang's cheek muscles "dropped to the floor" after her procedure, and encouraging others to seek refunds from plaintiffs. Wang also allegedly posted "guidance" on how to file complaints against Lee with the Board of Barbering and Cosmetology (Board), along with a "fill-in sample form."

Plaintiffs' third cause of action for intentional infliction of emotional distress did not allege any specific statements or acts taken by defendants and instead incorporated by reference the allegations regarding defendants' allegedly defamatory social media posts.

## B. The Anti-Slapp Motion

Huang filed an anti-SLAPP motion arguing that the complaint's first three causes of action should be stricken. She asserted that the causes of action arose from protected activity because they were based on defendants' activities of petitioning the Board and encouraging others to file regulatory complaints, as well as statements defendants made on a public forum regarding consumer protection information. Huang further contended the entire lawsuit was based on defendants' petitioning activities because plaintiffs filed their complaint after defendants reported to the Board the unlicensed practice of medical aesthetics by a Biz MedSpa employee. She also argued that plaintiffs had no probability of prevailing on their first three causes of action. She produced her declaration and the declaration of five other Biz MedSpa customers.

4

In opposition, plaintiffs argued that their first three causes of action did not arise from protected activity. They further argued that they established a probability of prevailing on those causes of action.[4] In support, plaintiffs submitted a two-page declaration from Lee.

The trial court denied the anti-SLAPP motion as to the first cause of action for defamation, concluding it did not arise from protected activity. The court found the second cause of action for intentional interference with prospective economic advantage was based in part on defendants' protected speech encouraging others to file complaints against Lee with the Board, but it denied the motion as to that cause of action because plaintiffs established a probability of prevailing on the claim. It granted in part the motion as to the third cause of action for intentional infliction of emotional distress against Huang to the extent it was based on the allegations regarding Board complaints.

## II. DISCUSSION

### A. Section 425.16 and the Standard of Review

Section 425.16, known as the anti-SLAPP statute, provides: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will

---

[4] Both parties also made various objections to each other's evidence. The trial court did not rule on the objections, and the record does not indicate that the parties pressed for a ruling. Therefore, the objections are deemed forfeited, and "in reviewing the trial court's order denying the motion, we consider all the evidence presented by the parties." (*Slauson Partnership v. Ochoa* (2003) 112 Cal.App.4th 1005, 1014, fn. 4.)

5

prevail on the claim." (§ 425.16, subd. (b)(1).) "The goal [of section 425.16] is to eliminate meritless or retaliatory litigation at an early stage of the proceedings." (*Seelig v. Infinity Broadcasting Corp.* (2002) 97 Cal.App.4th 798, 806.)

"Courts analyze anti-SLAPP motions using a familiar two-step analysis." (*Area 51 Productions, Inc. v. City of Alameda* (2018) 20 Cal.App.5th 581, 592.) "First, the defendant must establish that the challenged claim arises from activity protected by section 425.16." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384 (*Baral*).) Section 425.16, subdivision (e) enumerates four categories of protected conduct including, as relevant here, statements or writings made in a public forum in connection with an issue of public interest or any other conduct in furtherance of petitioning or free speech activity in connection with an issue of public interest. (§ 425.16, subd. (e)(3), (4).) If the defendant makes the required showing at the first step, the "burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success." (*Baral,* at p. 384.)

Plaintiffs' first three causes of action are based on several different actions allegedly taken by defendants, some of which constitute unprotected activity. With so-called " 'mixed cause[s] of action,' " causes of action based on allegations of both protected and unprotected activity (*Baral, supra,* 1 Cal.5th at pp. 381, 382), the focus of analysis shifts from evaluating the cause of action as a whole to evaluating individual claims so that the court can determine whether a claim, rather than a cause of action, constitutes a "proper subject of a special motion to strike" (*id.* at pp. 382, 395). For purposes of the anti-SLAPP statute, a claim refers to a set of facts allegedly giving rise to relief. (*Baral*, at pp. 382, 395.)

An order denying an anti-SLAPP motion is reviewed de novo.  (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 325.)  We review the record independently to determine whether the asserted claims arise from activity protected under the statute and, if so, whether plaintiffs have shown a probability of prevailing on the merits.  (*ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 999.)  We address plaintiffs' causes of action for defamation, intentional interference with prospective economic advantage, and intentional infliction of emotional distress separately.

### B. First Cause of Action for Defamation

In the present case, the trial court did not reach the second step of the anti-SLAPP analysis for plaintiffs' first cause of action for defamation because it ruled the claim did not arise out of protected activity.  Specifically, it concluded that the only protected activity alleged in their complaint formed the basis for a claim under the second cause of action but not the first.  That protected activity—as described in paragraphs 39 and 90 of the complaint— was defendants' alleged posting on social media of "a statement and guidance to provoke other users of the social media to file complaints against Dr. Lee with the [Board].  Fang Wang even provided a written fill-in sample form for everyone to use to complain about the plaintiffs."

Huang appears to argue that the trial court erred in concluding plaintiffs' defamation cause of action did not arise out of the alleged social media post regarding Board complaints.  She further contends that some of the alleged statements supporting plaintiffs' defamation claims were made in a public forum in connection with an issue of  public interest.  (§ 425.16, subd. (e)(3), (4).)  We address each contention in turn.

7

### *1. Plaintiffs' Defamation Claim Did Not "Arise From" the Alleged Statement Regarding Board Complaints*

A challenged cause of action "arise[s] from" protected activity when it is "based on" the protected activity. (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78, italics omitted.) "Typically, a pleaded cause of action states a legal ground for recovery supported by specific allegations of conduct by the defendant on which the plaintiff relies to establish a right to relief. If the supporting allegations include conduct furthering the defendant's exercise of the constitutional rights of free speech or petition, the pleaded cause of action 'aris[es] from' protected activity, at least in part, and is subject to the special motion to strike authorized by section 425.16[, subdivision] (b)(1)." (*Baral, supra*, 1 Cal.5th at pp. 381–382.) Stated differently, " 'the defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech.' " (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1063.)

But "[a]ssertions that are 'merely incidental' or 'collateral' are not subject to section 425.16." (*Baral, supra*, 1 Cal.5th at p. 394.) Thus, "[a]llegations of protected activity that merely provide context, without supporting a claim for recovery, cannot be stricken under the anti-SLAPP statute." (*Ibid.*) In reviewing Huang's anti-SLAPP motion, therefore, we must consider the elements of the challenged claim, the actions alleged to supply those elements (and thus form the basis for liability), and whether those actions are protected. (*Park v. Board of Trustees of California State University, supra*, 2 Cal.5th at p. 1063.)

"The elements of a defamation claim are (1) a publication that is (2) false, (3) defamatory, (4) unprivileged, and (5) has a natural tendency to injure or causes special damage." (*Wong v. Jing* (2010) 189 Cal.App.4th 1354,

8

1369; see *Smith v. Maldonado* (1999) 72 Cal.App.4th 637, 645 [defamation "involves the intentional publication of a statement of fact that is false, unprivileged, and has a natural tendency to injure or which causes special damage"].)

Here, it is evident from the face of the complaint that plaintiffs' defamation claims arise from the following alleged statements: (1) plaintiffs performed a procedure " 'upside-down' " on Wang; (2) Biz MedSpa "would not inject the hyaluronic acid to the customers with the full amount that the customer purchased, but save some, and inject the rest of the hyaluronic acid to themselves or others"; (3) Lee " 'reuses the disposable gloves and sponges' "; (4) they found " 'all the instruments are fake and come from Guangzhou, China' "; and (5) plaintiffs' " 'way of dealing with client complaints is to call the police and lawyers.' " The defamation cause of action identifies these specific statements and asserts they are false, nonprivileged, and caused reputational harm to plaintiffs because they suggested that plaintiffs were "engaged in disreputable business practices." Thus, they constitute the " ' "core injury-producing conduct upon which the [defamation] claim is premised," ' " and therefore give rise to plaintiffs' defamation claims. (*Starr v. Ashbrook* (2023) 87 Cal.App.5th 999, 1020.)

The allegation that defendants posted information on how to make Board complaints is not specified in the defamation cause of action itself, but rather, is included in the section of the complaint entitled "Facts Relevant to All Causes of Action," the entirety of which is incorporated by reference into the first cause of action. Huang contends that because the allegation is incorporated by reference, the trial court erred in concluding the defamation cause of action did not arise from the alleged social media post regarding Board complaints. But incorporation by reference alone does not satisfy her

9

burden on the first step of the anti-SLAPP analysis to establish that plaintiffs' defamation claim arises from the challenged statement. (See *Nirschl v. Schiller* (2023) 91 Cal.App.5th 386, 407–408.) Our review of the complaint reveals that the statement regarding Board complaints merely provides context because it did not itself support a claim for recovery for defamation. (See *Baral, supra*, 1 Cal.5th at p. 394.)

We also reject Huang's assertion that we should consider plaintiffs' intent to "chill" defendants' petitioning activities when evaluating whether plaintiffs' claims arise from protected activity. "Motives are irrelevant under section 425.16." (*Castleman v. Sagaser* (2013) 216 Cal.App.4th 481, 493–494.) "That a cause of action arguably may have been triggered by protected activity does not entail that it is one arising from such." (*City of Cotati v. Cashman*, *supra*, 29 Cal.4th at p. 78.) Instead, the focus should be on the substance of the lawsuit. (*Ibid.*) We therefore agree with the trial court that the first cause of action does not arise from the alleged social media post that provides information on how to make complaints to the Board.

### 2. *Some of the Statements Giving Rise to a Defamation Claim Constitute Protected Consumer Information*

Huang contends the anti-SLAPP statute applies to the defamation cause of action because it arises from her communications regarding issues of public interest—consumer "awareness" and protection. (§ 425.16, subd. (e)(3), (4).) Subdivision (e)(3) of section 425.16 protects "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest." And subdivision (e)(4) protects "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or any issue of public interest."

The California Supreme Court established a two-step inquiry in *FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133 (*FilmOn*) for determining whether speech or conduct was made "in connection with" an issue of public interest. (§ 425.16, subd. (e)(3), (4).) First, looking at the content of a challenged statement, courts must determine whether the statement implicates a public issue or an issue of public interest. (*FilmOn*, at pp. 150–151.) The *FilmOn* court cited with approval case law establishing three, non-exclusive categories of public interest: whether the speech concerned (1) a person or entity in the public eye, (2) conduct that could directly affect a large number of people beyond the direct participants, or (3) a topic of widespread public interest. (*Id.* at pp. 145–146, citing *Rivero v. American Federation of State, County, and Municipal Employees, AFL-CIO* (2003) 105 Cal.App.4th 913, 924.)

At the second step of the *FilmOn* inquiry, courts must consider the "functional relationship" between the challenged speech and public conversation about the matter. (*FilmOn*, *supra*, 7 Cal.5th at pp. 149, 150.) " '[I]t is not enough that the statement refer to a subject of widespread public interest; the statement must in some manner itself contribute to the public debate.' " (*Id.* at p. 150.) Courts thus "examine whether a defendant— through public or private speech or conduct—participated in, or furthered, the discourse that makes an issue one of public interest." (*Id.* at p. 151.) At this stage of the analysis, we must consider context, including the identity of the speaker, the audience, and the apparent purpose of the speech. (*Id.* at pp. 142–144, 152.)

In applying *FilmOn*'s standard here, we first observe that the defamatory statements, as alleged in the complaint, consisted of individual posts made across multiple social media platforms. Neither party produced

11

evidence to suggest otherwise.[5]  As such, because the challenged statements were made at different times and in different contexts, we address them separately, beginning with the statements posted on Redbook.  (See *Geiser v. Kuhns* (2022) 13 Cal.5th 1238, 1252–1253 [the context surrounding the challenged speech is a key consideration in determining whether that speech implicates a matter of public interest].)

### a. Huang's Redbook Posts

From our review of the record, it appears that defendants published two of the alleged statements on Redbook.  Regarding the statement that Lee "reuse[s] the disposable gloves and sponges," Huang's declaration stated that she found this information in a Yelp post detailing the experience of a Biz MedSpa former employee.  The Yelp post was attached to Huang's declaration and described the unsanitary conditions at Biz MedSpa.  The post noted that Lee "reuses the same gloves to examine different patients" and "reuses disposable facial sponges that are meant to be used per client" because they "are a bacteria hub."  Huang said she reposted the Yelp review on Redbook.

Additionally, the complaint alleged that defendants posted on Redbook the statement that a lawsuit filed against "BIZ" by " 'some clients' " revealed

---

[5] In fact, the actual social media posts at issue do not appear in the record, and Huang denied making many of the alleged statements.  This does not mean that she necessarily fails the first step of the anti-SLAPP analysis as to those posts.  "[A] defendant who denies engaging in the alleged conduct 'may rely on the plaintiff's allegations alone' in assessing whether the conduct at issue is protected activity."  (*Abir Cohen Treyzon Salo, LLP v. Lahiji* (2019) 40 Cal.App.5th 882, 888.)

12

that " 'all the instruments are fake and come from Guangzhou, China,' " apparently referring to plaintiffs' use of "fake" Thermage devices.[6]

According to Huang's declaration, Redbook " 'is a social media and e-commerce platform' " that " 'helps over 100 million users . . . to discover and review beauty and health products that can be hard to find in China.' " Huang described it as " 'China's answer to Instagram.' " Anyone can make a post on Redbook, and users can respond with their own comments. Posts on Redbook "can easily be searched by Google."

Keeping in mind that Huang need only make a prima facie showing on prong one of the anti-SLAPP analysis (*Paul v. Friedman* (2002) 95 Cal.App.4th 853, 863, abrogated on another ground by *Jacob B. v. County of Shasta* (2007) 40 Cal.4th 948, 960–962), we conclude that she has met her burden to show that her alleged Redbook posts were made in connection with an issue of public interest. (§ 425.16, subd. (e)(3), (4).)

"[C]onsumer information that goes beyond a particular interaction between the parties and implicates matters of public concern that can affect many people is generally deemed to involve an issue of public interest for purposes of the anti-SLAPP statute." (*Wong v. Jing*, *supra*, 189 Cal.App.4th at p. 1366; see *Melaleuca, Inc. v. Clark* (1998) 66 Cal.App.4th 1344, 1363 ["the public has a well-recognized interest in knowing about the quality and contents of consumer goods"].) Such statements, when made in a context that would assist others in choosing whether to patronize a business, are "directly connected to an issue of public concern" (*Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 900 (*Wilbanks*)), thereby satisfying *FilmOn*'s two-part

---

[6] The record shows that Thermage " 'is a non-invasive radiofrequency(RF) therapy that can help smooth, tighten, and contour skin for an overall younger-looking appearance.' "

inquiry. (*FilmOn*, *supra*, 7 Cal.5th at pp. 150–151 [citing *Wilbanks* with approval]; see also *Wong*, at p. 1367 [Yelp review about dentist was protected under § 425.16 because it "went beyond parochial issues concerning a private dispute"]; *Chaker v. Mateo* (2012) 209 Cal.App.4th 1138, 1141–1142, 1146–1147 [derogatory statements posted to "the Ripoff Report" web site about plaintiff's character and business constituted protected consumer information].)

*Wilbanks* is instructive. There, Wolk was a consumer watchdog who maintained a web site that provided consumer advice regarding viatical settlements, which are "arrangements that allow dying persons with life insurance policies to sell their policies to investors for a percentage of the death benefits." (*Wilbanks*, *supra*, 121 Cal.App.4th at p. 889.) Wilbanks was the chief executive officer of a viatical settlements broker. Wolk published a warning on her web site that Wilbank's company was under investigation by the Department of Insurance and that the company offered incompetent advice and was unethical. (*Ibid.*) Wilbanks sued Wolk for defamation and unfair business practices. (*Id.* at p. 890.)

In reviewing the trial court's order granting Wolk's anti-SLAPP motion, this court concluded that "[c]onsumer information, . . . at least when it affects a large number of persons, also generally is viewed as information concerning a matter of public interest." (*Wilbanks*, *supra*, 121 Cal.App.4th at p. 898.) The court explained, " ' "Members of the public have recognized their roles as consumers and through concerted activities, both private and public, have attempted to improve their . . . positions vis-à-vis the supplies [sic] and manufacturers of consumer goods. They clearly have an interest in matters which affect their roles as consumers, and peaceful activities, such as plaintiffs', which inform them about such matters are protected by the First

14

Amendment.' ' " (*Id.* at p. 899, quoting *Paradise Hills Associates v. Procel* (1991) 235 Cal.App.3d 1528, 1544, disapproved on another ground in *Kovis v. Howard* (1992) 3 Cal.4th 888, 898–899.) In *Wilbanks*, the record indicated that the viatical industry "touche[d] a large number of persons, both those who sell their insurance policies and those who invest in viatical settlements." (*Wilbanks*, at p. 899.)

The *Wilbanks* court distinguished the case from others holding that a publication does not become connected with a public issue merely because it was widely disseminated: "The statements made by Wolk were not simply a report of one broker's business practices, of interest only to that broker and to those who had been affected by those practices. Wolk's statements were a warning not to use plaintiffs' services. In the context of information ostensibly provided to aid consumers choosing among brokers, the statements, therefore, were directly connected to an issue of public concern." (*Wilbanks*, *supra*, 121 Cal.App.4th at p. 900.) The court therefore concluded that the plaintiff's claims arose from statements made in connection with a matter of public interest under section 425.16. (*Wilbanks*, at p. 901.)

The alleged Redbook posts are similar to the statements at issue in *Wilbanks*. Looking first to the content of the challenged statements to determine whether they implicate a matter of public interest (*FilmOn, supra*, 7 Cal.5th at p. 149), the statements are not just about a private dispute, as plaintiffs argued in the trial court. They concern the allegedly unsanitary practices of and the use of fake and (presumably) ineffective devices by a business that offers several "FDA-cleared" aesthetic treatments as alternatives to cosmetic surgery, which has "widespread and indiscriminate use" by the public. (See *Gilbert v. Sykes* (2007) 147 Cal.App.4th 13, 23, 17 (*Gilbert*).) The statements themselves make clear that Huang was not

15

relating her own experiences but reiterating information she apparently learned from others about plaintiffs' fraudulent and potentially dangerous practices. Moreover, the complaint alleged that plaintiffs have a "favorable and positive reputation in the community," and the evidence indicates that they currently serve hundreds, if not thousands, of customers. Thus, the statements implicate the public's interest in consumer information because they provide information "that goes beyond a particular interaction between the parties" and concerns conduct that could affect many others. (*Wong v. Jing*, *supra*, 189 Cal.App.4th at p. 1366; see *Healthsmart Pacific, Inc. v. Kabateck* (2016) 7 Cal.App.5th 416, 429 [statements regarding the installation of alleged counterfeit hardware concerned a public issue where " 'many thousands' " of individuals may have been installed with the hardware].)

Turning to the second step of the *FilmOn* inquiry regarding the "functional relationship" between the speech and the public interest (*FilmOn*, *supra*, 7 Cal.5th at pp. 149, 150), the challenged statements were made in a context of information Huang was providing to assist consumers in selecting aesthetic treatment providers. Huang posted the statements on a widely used web site similar to Instagram that is designed to aid consumers in selecting beauty products and services. (See *Jackson v. Mayweather* (2017) 10 Cal.App.5th 1240, 1252 [posts on the defendant's Instagram account were "made 'in a place open to the public or a public forum' " within the meaning of § 425.16, subd. (e)(3)].) Moreover, the evidence suggests that anyone looking to patronize Biz MedSpa would be able to find Huang's Redbook posts through a Google search. Thus, the statements were communicated to the public and, moreover, targeted an audience interested in aesthetic procedures. The challenged statements are therefore akin to the statements

16

at issue in *Wilbanks* that served as a warning not to use the plaintiff's services. (*Wilbanks, supra*, 121 Cal.App.4th at p. 900; see also *Yang v. Tenet Healthcare Inc.* (2020) 48 Cal.App.5th 939, 948 ["telling doctors to not refer patients to Yang is akin to consumer protection information"]; *Murray v. Tran* (2020) 55 Cal.App.5th 10, 34–35 [statements to dentist's current employer about dentist's substandard care promoted public conversation].)

While plaintiffs alleged that defendants published the statements out of retribution and to pressure plaintiffs to provide refunds, our high court cautioned that " 'speech is rarely "about" any single issue.' " (*Geiser v. Kuhns, supra*, 13 Cal.5th at p. 1249; see *Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1008 [regardless of "assertions of an illicit motive, '[i]f the acts alleged in support of the plaintiff's claim are of the sort protected by the anti-SLAPP statute, then anti-SLAPP protections apply' "].) Considering the content and context of the statements posted on Redbook, the focus of the challenged speech was on advancing the public interest, rather than on "a mere effort 'to gather ammunition for another round of [private] controversy.' " (W*einberg v. Feisel* (2003) 110 Cal.App.4th 1122, 1132–1133, disagreed with on another ground by *Paterno v. Superior Court* (2008) 163 Cal.App.4th 1342, 1351.) Accordingly, we conclude the statements allegedly posted on Redbook constitute protected consumer information for purposes of the anti-SLAPP statute.

Ordinarily, having concluded that defendants met their burden on prong one of the anti-SLAPP analysis, we would consider whether plaintiffs satisfied their burden on the second step of the analysis to establish a probability of prevailing on their claims. But because the trial court did not reach the second step, we may remand the matter to the court to conduct the second-prong analysis. (*Schwarzburd v. Kensington Police Protection &*

*Community Services Dist. Bd.* (2014) 225 Cal.App.4th 1345, 1355.) We will do so here so as not to "deprive the parties of a layer of independent review available to them when the matter is decided initially by the trial court." (*Collier v. Harris* (2015) 240 Cal.App.4th 41, 58.)

### b. Huang's Remaining Social Media Posts

Turning to the remaining statements giving rise to plaintiffs' defamation cause of action, it does not appear that either the complaint or the evidence submitted by the parties in connection with Huang's anti-SLAPP motion identify the social media platform on which the statements were posted. As mentioned, those statements were that plaintiffs performed a procedure " 'upside-down' " on Wang; that plaintiffs stole some of the hyaluronic acid paid for by their customers; and that plaintiffs' " 'way of dealing with client complaints is to call the police and lawyers.' " Since the complaint alleged that defendants made the defamatory statements on one of at least two social media web sites, Redbook and WeChat, and because it is Huang's burden to establish that the challenged speech constitutes protected activity (*Wong v. Jing*, *supra*, 189 Cal.App.4th at p. 1369), we will not presume the statements were made in a context similar to the alleged Redbook posts.

Relying primarily on *Gilbert*, *supra*, 147 Cal.App.4th 13 and *Terry v. Davis Community Church* (2005) 131 Cal.App.4th 1534 (*Terry*), Huang appears to suggest that the challenged statements constitute protected activity under section 425.16 regardless of whether they were posted on WeChat or Redbook. She argues that "the discussions posted on the sites were not limited to attacking Lee, but contributed to the general debate on consumer protection" and served as warnings not to use plaintiffs' services. We disagree.

18

While the challenged statements, like the ones posted on Redbook, arguably implicate the public's interest in receiving information relevant to their roles as consumers, thereby satisfying the first prong of the *FilmOn* analysis, the record contains very little information about the public accessibility of WeChat social media posts and almost no evidence surrounding the context of the challenged statements. This distinguishes the case from *Wilbanks*, where it was apparent that the web site at issue was publicly accessible and devoted to providing consumer information that could affect many people. (*Wilbanks*, *supra*, 121 Cal.App.4th at pp. 889, 895–897, 899–900.)

As the *FilmOn* court made clear, context matters in determining whether a statement was made "in connection with" an issue of public interest. (*FilmOn*, *supra*, 7 Cal.5th at p. 149.) The speech's audience and apparent purpose are two of the contextual cues that courts must consider in the second step of the *FilmOn* inquiry. (*Id.* at p. 152.) Thus, in cases involving speech that may be of interest to consumers, such speech generally does not constitute protected consumer information under section 425.16 where it was communicated in a manner unlikely to reach interested consumers. (See, e.g., *FilmOn*, at pp. 153, 154 [defendant's reports were not made in connection with a matter of public interest because it "issues its reports not to the wider public . . . but privately, to a coterie of paying clients"]; *Murray v. Tran*, *supra*, 55 Cal.App.5th at p. 31 [challenged speech was not protected under § 425.16 where "[t]here was . . . no evidence that [the defendant] intended or expected that any of the recipients would communicate to patients or other members of the public that [the plaintiff dentist] was an unqualified or incompetent dentist"].)

19

Even where the speech was widely disseminated, "[c]ourts must scrutinize the purpose of the statements, and where that purpose is simply to gather ' "ammunition for another round [of private controversy]," ' it is not in the public interest." (*Woodhill Ventures, LLC v. Yang* (2021) 68 Cal.App.5th 624, 636 (*Woodhill Ventures*).) In *Woodhill Ventures*, for example, the defendant had ordered a mad-science themed birthday cake from a bakery for his son's birthday party, and was unhappy when the cake arrived, decorated with icing formed into pills that looked realistic. (*Id.* at pp. 626–627.) The defendant made comments to his large social media following accusing the bakery of putting prescription pills on the cake, and the bakery sued for libel and slander. (*Id.* at pp. 628–629.) On appeal, the court, applying the second step of the *FilmOn* analysis, rejected the defendant's argument that his statements involved the public interest because they provided consumer protection information. (*Id.* at pp. 634–636.) The court reasoned that the defendant's statements "were only a diatribe" regarding his dissatisfaction over a single transaction, and thus "[t]hey were an unprotected effort ' "to gather ammunition" ' in his spat with" the bakery. (*Id.* at pp. 633–634.)

Based on the limited record before us, the allegedly defamatory statements, assuming they were posted to WeChat, are closer to the speech at issue in *Woodhill Ventures* than the challenged statements in *Wilbanks*. To begin with, nothing in the record shows that defendants intended the posts to reach consumers who may be interested in patronizing Biz MedSpa. The complaint alleged that defendants posted defamatory statements in a WeChat "group" or "subgroup" created by defendants. Huang's declaration clarified that Biz MedSpa created two WeChat groups to "advertise its services and products" to its "patrons," that the two groups had about 800 active users, and that one of those users posted a Quick Response (QR) code

20

in the group inviting plaintiffs' aggrieved customers to join another group "to defend their rights." Huang reposted the QR code the same day, though it is unclear where she posted it. Nor is there evidence identifying the WeChat group or groups in which the challenged statements were published. Moreover, there is no indication that any of the WeChat groups were open to the public or that consumers could somehow access the allegedly defamatory WeChat posts if they were not already a part of Biz MedSpa's WeChat group.

Further, the apparent purpose of the WeChat subgroup that defendants allegedly created was to provide a forum for dissatisfied customers to air their individual grievances, rather than provide information to aid consumers. The user who initially posted the QR code urged anyone who "has project done at BizMedSpa and needs to protect his or her rights" to scan the code and enter the group, but directed "[s]isters who have not been ensnared [to] go to see [Biz MedSpa's] google review[s]." Approximately 240 users joined the WeChat subgroup and "shared their bad experiences with BizMedSpa." Huang characterized the group as consisting of patrons "who averred to be victimized by improper procedures of BizMedSpa" and shared "the common experience of bad results." Indeed, the excerpt she provided of the group's discussion consisted of users expressing their subjective experiences with plaintiffs, along with a few stray comments urging others to "report" plaintiffs or sue them. In this context, the specific statements at issue were unprotected efforts to "whip up a crowd for vengeful retribution." (*Woodhill Ventures*, *supra*, 68 Cal.App.5th at pp. 632–633.)

*Gilbert* and *Terry* do not aid Huang. In *Gilbert*, the website at issue was not "limited to Gilbert's interactions with" the plastic surgeon she allegedly defamed, but also contained "advice, information and a contact page where readers [could] share their own experiences." (*Gilbert*, *supra*,

21

147 Cal.App.4th at p. 24.) Further, there was no dispute that the web site was open to the public. (*Id.* at pp. 19, 21, 23.) Thus, Gilbert's web site contributed to the public debate about cosmetic surgery. (*Id.* at pp. 23–24.) Likewise, the church report challenged in *Terry* about a youth group leader who had an inappropriate relationship with a minor advanced "the societal interest in protecting a substantial number of children from predators," because the report was discussed with concerned parents at church meetings. (*Terry*, *supra*, 131 Cal.App.4th at pp. 1547, 1543, 1548.)

*Gilbert* and *Terry* are examples of cases where the "wedding of content and context" shows that the challenged speech "contributes to or furthers the public conversation on an issue of public interest." (*FilmOn*, *supra*, 7 Cal.5th at p. 154; see *id.* at p. 146 ["contextual factors mattered in . . . *Terry*"].) We cannot say the same for the alleged WeChat posts, considering they implicated matters of interest to consumers but were directed to a limited audience of dissatisfied customers.

Huang acknowledges the WeChat subgroup was "selective," but she contends this does not "diminish the forum as a vehicle for open discussion of public issues," citing *Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468, 478 (*Damon*). *Damon* is part of a line of decisions where the protected activity concerned matters that would "affect[] a community in a manner similar to that of a governmental entity." (*Id.* at p. 479; see *Ruiz v. Harbor View Community Assn.* (2005) 134 Cal.App.4th 1456, 1468 [public interest found because homeowners "would be affected by the outcome of [the] disputes and would have a stake in [the homeowners association] governance"].) In such cases, "where the issue is not of interest to the public at large, but rather to a limited, but definable portion of the public (a private group, organization, or community), the constitutionally protected activity

22

must, at a minimum, occur *in the context of* an ongoing controversy, dispute or discussion, such that it warrants protection by a statute that embodies the public policy of encouraging *participation* in matters of public significance." (*Du Charme v. International Brotherhood of Electrical Workers* (2003) 110 Cal.App.4th 107, 119, 118, first italics added, citing *Damon, supra*, at p. 479.)

Even assuming the WeChat group could be characterized as a definable portion of the public for purposes of section 425.16, the record does not present any ongoing dispute or controversy about a matter that would affect the entire WeChat group "similar to that of a governmental entity." (*Damon, supra*, 85 Cal.App.4th at p. 479.) Plaintiffs' dissatisfied customers may have had their own ongoing disputes with plaintiffs, but such individualized issues did not require a public debate. (See *Weinberg v. Feisel, supra*, 110 Cal.App.4th at p. 1132 [" 'public interest' does not equate with mere curiosity" or include matters "of concern to the speaker and a relatively small, specific audience"].) While Huang contends there was a "heated" discussion about plaintiffs' "unlicensed practices," along with a "call[] for consumer awareness," there was no showing that the specific statements at issue referred to those matters or contributed to any larger discussion about consumer awareness or the licensing of medical clinics and staff.[7] To grant protection to the challenged statements in this context would not further the

---

[7] Huang requests that we take judicial notice of an "Accusation" filed by the Department of Consumer Affairs in March 2023 based on a report made by "Consumer T.H." that a Biz MedSpa employee performed a procedure on her without the proper medical license. We decline to take judicial notice of the accusation because the document was not before the trial court and it does not appear relevant or helpful to our analysis. (See *Appel v. Superior Court* (2013) 214 Cal.App.4th 329, 342, fn. 6.)

23

statute's purpose of encouraging "participation in matters of public *significance*." (§ 425.16, subd. (a), italics added.)

Finally, we reject Huang's suggestion that the challenged statements are protected under the anti-SLAPP statute because Lee "thrust himself into a public debate of consumer protection" by creating the WeChat groups and making posts on Redbook to which readers could respond. As support, she cites the complaint's general allegations describing Lee's qualifications and Biz MedSpa's services, as well as evidence showing that plaintiffs made posts on WeChat and Redbook regarding the current lawsuit, which garnered responses focused mostly on Biz MedSpa's alleged licensing issues. This evidence does not demonstrate that the specific statements at issue here contributed to or furthered any public debate on matters of public interest.

The relevant authority Huang relies on, *Chaker v. Mateo, supra*, 209 Cal.App.4th 1138, is distinguishable. The plaintiff there "became the subject of statements on the 'topix' Web site only after he posted a profile on the Web site and it generated responses from other members of the community, including apparently statements from [the defendant]. Having elected to join the topix Web site, [the plaintiff] clearly must have recognized that other participants in the Web site would have a legitimate interest in knowing about his character before engaging him on the Web site. Thus, [the defendant] himself made his character a matter of public interest as the term has been interpreted." (*Id.* at pp. 1146–1147.) Here, in contrast, there is no indication the WeChat groups were web sites "where members of the public [could] comment on the reliability and honesty of various providers of goods and services" or that they "provided an open forum for members of the public to comment on a variety of subjects." (*Id.* at p. 1142.) In fact, Huang's evidence shows plaintiffs closed the WeChat groups shortly after the QR code

24

was posted to the groups.  Nor is there an indication the challenged speech was responding to anything plaintiffs posted on WeChat or Redbook.  (See *id.* at pp. 1146–1147.)

In sum, Huang has failed to establish that the following statements were made in connection with an issue of public interest under section 425.16, subdivision (e)(3) or (e)(4):  (1) plaintiffs performed a procedure " 'upside-down' " on Wang; (2) Biz MedSpa "would not inject the hyaluronic acid to the customers with the full amount that the customer purchased, but save some, and inject the rest of the hyaluronic acid to themselves or others"; and (3) plaintiffs' " 'way of dealing with client complaints is to call the police and lawyers.' "  Accordingly, she has failed to meet her burden on prong one of the anti-SLAPP analysis as to plaintiffs' defamation claims that arise from those statements.[8]

## C. *Second Cause of Action for Intentional Interference with Prospective Economic Advantage*

The trial court found that plaintiffs' second cause of action for intentional interference with prospective economic advantage arose from protected activity because it was based on defendants' alleged posting of guidance on how to make complaints to the Board regarding plaintiffs. Plaintiffs do not challenge this finding on appeal.  We therefore move on to examine the second prong of the anti-SLAPP statute.

---

[8] There appears to be at least one alleged "consumer protection" statement supporting the second cause of action that was not asserted as a supporting allegation for the first cause of action.  For the same reasons set forth in this section, we conclude Huang has failed to meet her burden on prong one of the anti-SLAPP analysis as to that statement because there was insufficient evidence of the context in which the statement was made.

The second step of the anti-SLAPP analysis follows a "summary-judgment-like procedure." (*Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 192.) We "consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b)(2).) Looking at those affidavits, "[w]e do not weigh credibility, nor do we evaluate the weight of the evidence. Instead, we accept as true all evidence favorable to the plaintiff and assess the defendant's evidence only to determine if it defeats the plaintiff's submission as a matter of law." (*Overstock.com, Inc. v. Gradient Analytics, Inc.* (2007) 151 Cal.App.4th 688, 699–700, disagreed with on another ground by *Muddy Waters, LLC v. Superior Court* (2021) 62 Cal.App.5th 905, 924.)

"Intentional interference with prospective economic advantage has five elements: (1) the existence, between the plaintiff and some third party, of an economic relationship that contains the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentionally wrongful acts designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm proximately caused by the defendant's action." (*Roy Allan Slurry Seal, Inc. v. American Asphalt South, Inc.* (2017) 2 Cal.5th 505, 512.)

Here, the trial court concluded that plaintiffs had established a probability of prevailing as to their cause of action for intentional interference with prospective economic advantage by offering evidence that defendants intended to harm plaintiffs' business and reputation by attacking the quality of their work and "organiz[ing] people against [Lee] through postings" on social media. Based on these findings, it denied Huang's anti-SLAPP motion as to plaintiffs' second cause of action. Huang contends this was error. We agree.

26

Plaintiffs did not present any evidence of causation, which is an essential element of the cause of action for intentional interference with prospective economic advantage. Indeed, the only evidence that plaintiffs presented, Lee's declaration, did not give any specifics as to any economic harm proximately caused by defendants' social media posts. Lee stated only that he was "extremely concerned about the damage their acts have done to my professional reputation and my business." This is insufficient to establish causation for plaintiffs' claims for intentional interference with prospective economic advantage, which requires, at a minimum, " 'proof that it is reasonably probable that the lost economic advantage would have been realized but for the defendant's interference.' " (*Kasparian v. County of Los Angeles* (1995) 38 Cal.App.4th 242, 271, italics omitted, disagreed with on another ground by *Asahi Kasei Pharma Corp. v. Actelion Ltd.* (2013) 222 Cal.App.4th 945, 964–965; see also *George v. eBay, Inc.* (2021) 71 Cal.App.5th 620, 639 [plaintiffs' reference to "repeat buyers" insufficient when no facts show those buyers would generate future business].)

Accordingly, we conclude Huang's anti-SLAPP motion should have been granted as to the second cause of action against her for intentional interference with prospective economic advantage based on her posting guidance regarding the filing of a Board complaint and encouraging others to file Board complaints. We further conclude the motion should have been granted as to the second cause of action against Huang based on the allegations we have concluded constitute protected consumer information. The trial court found the second cause of action arose from those allegations as well, a finding the parties do not challenge on appeal. Although the trial court did not reach the second step of the anti-SLAPP analysis as to the protected consumer information allegations, we believe it will further judicial

27

economy for us to reach the second prong as to plaintiffs' second cause of action instead of remanding to the trial court to determine the issue.[9]  (See *Schwarzburd v. Kensington Police Protection & Community Services Dist. Bd.*, *supra*, 225 Cal.App.4th at p. 1355 [electing to reach second prong in first instance].)

### D. Third Cause of Action for Intentional Infliction of Emotional Distress

This cause of action does not allege any specific acts taken by defendants and instead incorporated by reference the allegations in the defamation cause of action.  It further alleged that defendants, "by their intentional acts and intentionally false statements, have engaged in extreme and outrageous conduct directed at plaintiffs" and that as a result, "plaintiffs have suffered and have sustained severe and extreme emotional distress." The "intentional acts and intentionally false statements" presumably include Huang's protected statements that also give rise to plaintiffs' causes of action for defamation and intentional interference with prospective economic advantage, so the allegations that we have determined must be struck from those causes of action are "similarly eliminated from the causes of action into which [they have] been incorporated." (*Kajima Engineering & Construction, Inc. v. City of Los Angeles* (2002) 95 Cal.App.4th 921, 931.)  All other claims presented by that cause of action remain because Huang has not shown that

---

[9] We do not have the same concerns that the parties would be deprived "of a layer of independent review" (*Collier v. Harris*, *supra*, 240 Cal.App.4th at p. 58.) as with the first cause of action for defamation, given the trial court reached the second prong of the anti-SLAPP analysis as to the second cause of action based on a different claim and there is a complete absence of causation evidence.

they arise out of protected activity.  (See *Bonni v. St. Joseph Health System*, *supra*, 11 Cal.5th at pp. 1010–1011.)

## III.   DISPOSITION

The order denying Huang's anti-SLAPP motion is affirmed in part and reversed in part.  The matter is remanded to the trial court with directions to determine whether plaintiffs met their burden of demonstrating a probability of prevailing on their first cause of action against Huang based on the alleged statements regarding plaintiffs reusing disposable gloves and sponges and using "fake" instruments from China.  The trial court is further directed to enter an order granting the anti-SLAPP motion as to (1) the second and third causes of action against Huang based on the alleged statements regarding plaintiffs reusing disposable gloves and sponges and using "fake" instruments from China; and (2) the second cause of action against Huang based on the allegations relating to Board complaints.  The parties are responsible for their own costs on appeal.

LANGHORNE WILSON, J.

WE CONCUR:

HUMES, P. J.

BANKE, J.

A167189
*Mahoney v. Huang*